246 N.J. Super. 619 (1990)
588 A.2d 446
IN THE MATTER OF THE ADOPTION OF A CHILD BY J.R.D.
Superior Court of New Jersey, Chancery Division Family Part, Bergen County.
Decided October 23, 1990.
*621 Bruce J. Sartori for J.R.D.
*622 Joseph J. Haskins, Jr. for G.D. (Dunn, Pashman, Sponzilli, Finnerty & Swick, attorneys).
Arthur J. DelColliano for C.J.D.
Myra T. Peterson, guardian ad litem, for C.J.D.
HARRIS, J.S.C.

INTRODUCTION.
This is a contested stepfather adoption pursuant to N.J.S.A. 9:3-48. It pits J[1], the stepfather (and perhaps psychological father) of a seven-year-old girl, against the infant's natural father, G. What this case is really about, however, are the primitive emotions associated with parenthood, and the management of such fragile human nature that the Family Part is called upon to service daily. The arid lip service of the law will likely be unsatisfactory to explain to the losing party in this matter why it must be so. Nevertheless, by treading water in an area so humanly basic, elemental, and delicate, it is impossible to fully explicate the rationale for the decision without resort to traditional and customary legalisms and precedent. In other words, how does one tell a father in this action either that he may not adopt his psychological child or that he may never see his natural child again? What follows is the court's attempt at explanation.

FINDINGS OF FACT.
G and F were married on April 24, 1976. After a stormy run of separations and reconciliations, they gave birth to C on June 13, 1983. Shortly thereafter, on August 8, 1984, G and F obtained a judgment of divorce.
*623 J met F at work after F's divorce. On April 4, 1987 they were wed, and J became the stepfather of C.
J and F both work outside of the home, although F's primary role in their marital partnership is to provide child care and homemaking. J is employed as an auto service technician who earns in excess of $30,000 a year. The family lives modestly, and apparently very happily.
C has been described by the guardian ad litem as a "charming, articulate little girl." The report of the Children's Aid and Adoption Society of New Jersey describes C as "a charming, sociable, expressive little girl."
J and F claim that the natural father intentionally abandoned his daughter and substantially neglected his parental duties without a reasonable expectation of a reversal in the future. The guardian ad litem, who interviewed all of the participants, and who unselfishly obtained a pro bono evaluation of the natural father by a well-respected psychological expert, concurs in the position that G's parental rights should be terminated.
G admitted that he is suffering from chronic alcoholism and is presently undergoing out-patient treatment at a Veteran's Administration hospital for cirrhosis. He claims that he has not consumed alcoholic products since being released from a hospital visit related to his addiction in February 1990. He has been told that if he falls off of the wagon, he will be dead within two months. He further admits, however, that he does not actively participate in any ongoing group counseling such as Alcoholics Anonymous because he believes that he is capable of dealing with the disease alone.
G recognizes that his minimal involvement in C's life is primarily his fault and lack of responsibility. He acknowledges that during the early years of her infancy, he made no attempt to visit or contact her. In fact, both natural parents agree that there was only one visit between daughter and natural father since the divorce, and that it was only an afternoon encounter. G's excuse for not contacting his daughter is that he was *624 incapable of establishing a normal human relationship due to his alcoholism. Furthermore, not being adept at interrelating to small children, G believed that it would have been better if his daughter and former wife lived independently of him until his daughter matured somewhat. G concedes that during the depression of his alcoholism, he feared for the safety of his daughter if he were to exercise visitation. In order to obviate the possibility of harm, he remained aloof.
G made some half-hearted attempts to find his former wife and daughter when they moved from Hudson County to Bergen County. The only consistent contact between G and his former wife over the last six years was through probation department enforcement proceedings to compel child support payments in Hudson County. At no time during those ongoing enforcement proceedings did G request the implementation of visitation rights with his daughter. G claims that he did not know that he had a right to ask for visitation during such proceedings. He was not represented by an attorney during that period of time.
The only other contact between G and his former wife over the last six years was limited to discussions regarding the impending adoption proceedings, where G openly, consistently, and steadfastly objected to suffering the termination of his parental rights. He expressed concern at the hearing that if he lost his daughter, she would never know him and his side of the family. As an example, he fears that C will never realize that she was named for a maternal and paternal great grandmother.
F, the natural mother, did not conceal her whereabouts or try to insulate C from her natural father. For approximately two years after the divorce F maintained contact with G's mother, C's grandmother. Contact was lost after repeated frustration was incurred by the failure of G to make consistent child support payments. F was understandably bitter toward G as a result of his persistent failure to pay child support. The *625 judgment of divorce required G to pay $125 a week as child support. This was obtained primarily through wage garnishments, until G lost his job as a result of his substance abuse. Thereafter, child support was ultimately reduced to $25 a week of support plus $10 a week for arrears. (Although there was no direct evidence of the amount of arrears, it appears that at one time it exceeded $14,000!) G has recently maintained a current payment status through the generosity of his mother, who makes payments to the Hudson County Probation Department on his behalf. G, who claims to be presently unemployed, has applied for disability benefits. He resides with his mother.
J, the stepfather, was previously married and is the father of a ten-year-old boy. He pays $75 a week child support to his first wife. C and J's son are friends; they see each other when J exercises his regular visitation. F, the natural mother, has consented to the adoption, and notwithstanding her longstanding animosity, she spoke evenhandedly and fairly about G. She did not portray him as an ogre or as a wholly unfeeling person. She simply recounted the loneliness and abandonment which she and C felt following the divorce. She also confirmed the horror of living with an alcoholic spouse.

CONCLUSIONS OF LAW.

Termination of Parental Rights.
The substantial number of stepparent adoptions is no longer considered a surprising or an unusual phenomenon. See, for example, Matter of Baby M, 109 N.J. 396, 537 A.2d 1227 (1988); In re Adoption of Children by D., 61 N.J. 89, 293 A.2d 171 (1972); In re Mercado Adoption, 182 N.J. Super. 628, 442 A.2d 1078 (App.Div. 1982); In re Adoption by J.J.P., 175 N.J. Super. 420, 419 A.2d 1135 (App.Div. 1980); In re Adoption of a child by E.M., 124 N.J. Super. 272, 306 A.2d 467 (App.Div. 1973); Matter of Adoption by Benigno-White, 223 N.J. Super. 72, 537 A.2d 1345 (Ch.Div. 1987); In re Adoption of Children by F., 170 N.J. Super. 419, 406 A.2d 986 (Ch.Div. 1979); C. v. R., 169 *626 N.J. Super. 168, 404 A.2d 366 (Ch.Div. 1979). Nevertheless, the frequency of such actions does not temper their poignancy, or make the court's task any easier.
Our society has long considered it self-evident that parents are entitled to retain and enjoy their parental rights, except in extraordinary circumstances. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). This right has recently been described by the New Jersey Supreme Court as the fundamental "right to the companionship of one's child." Matter of Baby M, supra, 109 N.J. at 447-452, 537 A.2d 1227.
There is a primeval, raw, genetic imperative here. Very few parents are capable of shedding the connection to their children willingly. Humans are not like sea turtles who lay their eggs on the beach and then turn around to return to the ocean without even a glance back. Turtle offspring never know their parents. Human beings do not so easily part with their brood.
We are part of a mammalian primate heritage that has existed for more than 65 million years. Homo sapiens evolved only 40,000 years ago from our immediate ancestors, the primitive hominids, which themselves evolved only two to three million years ago. Washburn estimates that over 90 per cent of human history was spent in hunting and gathering societies. [footnote omitted] Against this background, the two hundred years in which industrial societies have existed is a short time indeed, to say nothing of the mere twenty years in which a few of the most advanced industrial societies have been undergoing the painful transition to a post-industrial societal age. Our most recent genes derive from that longest segment of human history during which men and women lived in hunting and gathering societies; in other words, Westernized human beings now living in a technological world are still genetically equipped only with an ancient mammalian primate heritage that evolved largely through adaptations appropriate to much earlier times. [Rossi, "A Biosocial Perspective on Parenting," 106 Doedalus 1, 3 (Spring, 1977: The Family)]
Nevertheless, this instinctive and constitutional right is not absolute:
The parent-child biological relationship, by itself, does not create a protected interest in the absence of a demonstrated commitment to the responsibilities of parenthood; a natural parent who does not come forward and seek a role in the *627 child's life has no constitutionally protected relationship. Lehr v. Robertson, supra, 463 U.S. [248] at 258-62, 103 S.Ct. [2985] at 2991-93, 77 L.Ed.2d [614] at 624-27 [(1983)]; Quilloin v. Walcott, supra, 434 U.S. [246] at 254-55, 98 S.Ct. [549] at 554, 54 L.Ed.2d at [511] 519-20 [(1978)]. The right is not absolute in another sense, for it is also well settled that if the state's interest is sufficient the right may be regulated, restricted, and on occasion terminated. See Santosky v. Kramer, supra, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599. [Matter of Baby M, supra, 109 N.J. at 451, n. 14, 537 A.2d 1227].
Thus, in order to terminate G's rights as a father, clear and convincing evidence of the statutory criteria must be presented. New Jersey D.Y.F.S. v. A.W., 103 N.J. 591, 612, 512 A.2d 438 (1986). Notwithstanding sporadic flashes of brilliance, J has overall failed to demonstrate this quality of proof.
The guardian ad litem has suggested that this court should balance the natural father's well-recognized constitutional right to the companionship of his child against the child's concomitant 14th Amendment right to be free of undue deprivation of life, liberty or property. The guardian ad litem further asserts that the New Jersey Constitution (1947) provides an independent platform upon which to launch a balancing test:
All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, or acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness. [N.J. Const. (1947), Art. 1, ¶ 1]
The end result of the balancing test, asserts the guardian ad litem, would be to decide the question of the termination of the natural father's parental rights on the basis of the best interests of the child.
The clash of these principles appears to have been settled in Matter of Baby M, supra, 109 N.J. at 447-452, 537 A.2d 1227, which adequately addresses the balance to be struck between a natural parent's rights versus the rights of her child. No matter how appealing the guardian ad litem's argument may seem, especially when tinged with the natural sympathy accorded the rights of children, the principle of law which is applicable elevates the natural parent's rights slightly higher than the child's. Accordingly, there is no occasion for this court to upset *628 the settled equilibrium where the Supreme Court has so recently set it straight.
As a general proposition, applicable to all adoption procedures, N.J.S.A. 9:3-46 provides:
Any parent who has not executed a surrender pursuant to section 5 and whose parental rights have not been terminated by court order shall have the right to object to the adoption of his child. No judgment of adoption shall be entered over an objection of such parent communicated to the court by personal appearance or by letter unless the court finds that such parent has substantially failed to perform the regular and expected parental functions of care and support of the child, which shall include regular maintenance of an emotional relationship with the child. [Emphasis supplied]
Similarly, in the context of a nonapproved agency adoption (the stepparent category), N.J.S.A. 9:3-48(c)(1) permits the entry of a judgment of adoption over the objection of the natural parent only if the court finds that:
the parents of the child do not have rights as to custody of the chlid by reason of their rights previously having been terminated by court order, their failure to make timely objection to the adoption pursuant to section 10, or intentional abandonment or very substantial neglect of parental duties without a reasonable expectation of a reversal of that conduct in the future. ... [Emphasis supplied]
The statutory scheme, although employing different semantics, is consistent with prior law, N.J.S.A. 9:3-18(d), which prohibited an adoption award terminating the rights of a natural parent without a finding that such natural parent had "forsaken parental obligations" by willful and continuous neglect or failure to perform the natural and regular obligations of care and support of the child. It is recognized that the immutable and permanent consequences of adoption require that the decision to effect the destruction of the child's relationship with her natural father be virtually doubt free. See In re N, 96 N.J. Super. 415, 425, 233 A.2d 188 (App.Div. 1967).
In this case, although it may be apparent to some that the best interests of the child will be advanced by entering a judgment of adoption, the facts bespeak neither an intentional abandonment or substantial neglect of parental duties, nor a reasonable expectation of such a course of conduct to continue *629 in the future. The natural father suffers from debilitating alcoholism which explains his disinterestedness in parenting over the last six years. Furthermore, although he was less than diligent in trying to seek out or search for his former wife and daughter, it appears that he never purposefully attempted to escape from the scene. Plainly, he was the outsider when his former wife remarried. His failure to attempt to visit with his daughter is more attributable to his pathetic physical addiction than to a mindset fixed upon evasion of responsibility. His less than admirable record of employment and intermittent payment of child support, while evidential of neglect, does not constitute abandonment. In the spectrum of "delinquent daddies," G is today far from the end of the range that comprises those who need coercive incentives to comply with court orders. Even though the present source of funds for child support comes from the grandmother, this does not detract from G's contributions over time.
Moreover, trial courts are counseled to view the natural parent's participation in the litigation process itself as evidence of lack of disinterestedness or abandonment.
The very fact the natural father has seen fit to prosecute an appeal from the judgment terminating his parental rights suggests the potential of such a future course of conduct and should be carefully considered by the trial court. [In re Mercado Adoption, supra, 182 N.J. Super. at 631, 442 A.2d 1078]
Additionally, G's recent sobriety suggests that he is capable of rational thought and expression. His failure to recognize that he might need assistance to succeed in conquering the disease suggests the opposite. The court seriously questions whether G is capable of resisting his urges to consume alcohol alone and without a support group. Nevertheless, reduced to its essence, G has not lost the spark of life; he wants to survive. It is no surprise that he also wants to be part of his daughter's life, even if it be minimal.
The natural father has not requested visitation rights during the pendency of this action. That failure should not be held against him. Nor should the fact that he did not affirmatively *630 plead for visitation relief disqualify him from obtaining such a remedy. See In re Adoption by J.P.P., 175 N.J. Super. 420, 426, 419 A.2d 1135 (App.Div. 1980). The natural father seeks only minimal visitation rights and has expressed a willingness to take part in supervised visitation and a mediation process to devise a visitation schedule acceptable to all parties. See Wilke v. Culp, 196 N.J. Super. 487, 502, 483 A.2d 420 (App.Div. 1987).
The position of the guardian ad litem has not been ignored. She expressed an opinion that indicated that she was not sanguine about the future commitment of G towards reestablishing a normal noncustodial-parent relationship with her ward. She also opined that G's motivation in challenging the adoption is duplicitous, and that G is somewhat insensitive to the role of a parent and the demands of parenting. The guardian ad litem had G examined by an expert on parent-child relationships, which expert apparently concurred with the guardian ad litem's assessment and recommendation. Nevertheless, the guardian ad litem conceded that G's physical appearance had markedly improved since she last interviewed him. She described him then looking "as if he is in his 60's" and "[G] looks many years older than his physical age and somewhat worse for the wear." G is 41-years old. The ravages of alcoholism cause him, indeed, to appear to be at least ten years older. Despite this wear and tear, the court observed a passion in G's testimony that belied a root in vengeance, or which was created by a lawyer's coaching. He appears truly desirous to remain C's father and to influence her life, even if only for stubborn blood reasons.
The primary focus in this proceeding is to ascertain whether the statutory factors exist. It is clear that a "best interest" determination is never sufficient to terminate parental rights; the statutory criteria must be proved. Matter of Baby M, supra, 109 N.J. at 428-429, 537 A.2d 1227. Although the statutory descriptions of the conditions required to terminate *631 parental rights differ, their interpretation in case law tends to equate them. Distilled to their essence, the procedures[2] to terminate parental rights all revolve around the necessity for a very strong showing of abandonment or neglect. No such strong showing has been made at this time[3].

Visitation.
Having concluded that G shall not be deprived of his parental rights, the target of attention shifts to the best interests of the child. Given the length of time that G has been deprived (as a result of his addiction and inattention) of a relationship with C, and the infant's understandable reluctance to meet him, the court must trek conservatively and in a most benign fashion. G does not appear to be an "unfit" parent. He presents no per se physical or emotional danger to his daughter. Yet, his mere reappearance on the scene may negatively impact upon the child. The guardian ad litem has recommended that if visitation shall be allowed, it should be supervised in a therapeutic setting, i.e., in the presence of an individual trained to assist in the reintroduction of a parent with his child. This is qualitatively different from ordinary supervised visitation under the gaze of government monitors.
This recommendation is sensible, and is not seriously questioned by G. To that end, the court shall order G, F, J, and the *632 infant to participate in mediation and counselling services under the supervision and direction of the Bergen County Department of Family Guidance. The purpose of this mediation and counselling is ultimately to enable G to visit with his daughter in a dignified manner.
There shall be no visitation until a further review by the court of the mediator/counsellor's report and recommendation as to the nature, scope, and duration of any visitation.[4] All parties shall participate in the mediation and counselling services, and shall have an opportunity to be heard on its recommendations before the court permits actual visitation. G shall be enjoined from intentionally having any contact with C until further order of the court. It is expected that an initial report and recommendation shall be made available to the court within 45 days. All parties are ordered to cooperate with the mediation/counselling service, and with each other, in order to allow the evolution of G's relationship with his daughter to advance.
Furthermore, in order to provide surveillance of G's alcoholism, G shall participate in the Bergen County Alcohol Rehabilitation Program, which agency shall provide counselling and an evaluation of G's condition on a regular basis, including the rendering of a report to the court prior to permitting actual visitation.
Finally, pursuant to R. 5:8-1, the Bergen County Probation Department shall conduct an investigation of the character and fitness of the parties for purposes of ascertaining the appropriate visitation for G with C.
Upon the receipt of all such reports, the court shall schedule a review hearing at which time it shall interview the infant and *633 take such additional testimony as is necessary in order to fashion a best interests visitation scheme for this family.

CONCLUSION.
This decision is not about winning or losing. Such perception suggests an ending, rather than what is intended by the court to be a process leading to an end. G has heretofore been the main point of concentration, with C being considered only slightly secondarily. Now, the court and parties must shift gears and concentrate on C's best interests, so that the one innocent participant in this ordeal is not harmed.
The guardian ad litem is directed to prepare the appropriate form of order to memorialize this opinion. She may also submit an interim certification of services. R. 5:8B. The attorney for the infant is hereby relieved of his representation because the court determines that the guardian ad litem (an experienced and well-respected family law practitioner) can adequately represent the interests of the infant. The attorney for the infant may submit his certification of services in accordance with R. 5:8A. The court expresses its thanks to this attorney for the services rendered heretofore.
It is the intention of the court that this decision constitutes a complete adjudication of a separate claim in the litigation pursuant to R. 4:42-2 and R. 5:10-6. As such, this decision is deemed final for the purposes of appeal.
NOTES
[1] For ease of reference, the court has abbreviated the actual initials of the participants in this action.
[2] A termination may ordinarily take one of three forms: an action by an approved agency, an action by DYFS, or an action in connection with a private placement adoption. Matter of Baby M, supra, 109 N.J. at 426-427, 537 A.2d 1227.
[3] Matters of custody and visitation are generally not considered to be final. Although a determination terminating the natural father's rights precludes modification based upon changed circumstances, In re N, supra, 96 N.J. Super. at 423, 233 A.2d 188, the opposite proposition is not necessarily true. Following this decision, if G does not, in fact, attempt to restructure his relationship with his daughter to a meaningful level, a new action by the stepfather may be prosecuted. Only time will determine whether the court or the guardian ad litem is a better augur.
[4] It is, of course, ultimately possible that no visitation shall be permitted. Cf. Wilke v. Culp, supra, 196 N.J. Super. at 503, 483 A.2d 420, and cases cited therein.