696 A.2d 116

IN THE MATTER OF THE ADOPTION OF A CHILD BY R.K.

Superior Court of New Jersey
Chancery Division
Family Part
Hudson County

Decided February 28, 1997.

184

*Carolann Aschoff*, for plaintiff R.K.

*Diane Simpson*, for defendant J.S.

HUNTER, J.S.C.

This is a contested stepfather adoption of a six-year-old child. The stepfather argues that since the natural father has substantially failed to perform the regular and expected parental functions of care and support of the child, though able to do so, his parental rights should be terminated, and the adoption allowed to go forward over the natural father's objections. The natural father argues that the natural mother prevented him from fulfilling his parental obligations.

## I

J.S., the father of the child, and M.S., the mother of the child, met in Florida. Their relationship resulted in a female child, born June 29, 1989. In September 1989, the couple married. The marriage was not happy and in March 1990, M.S. took the child and moved to New Jersey, where she was originally from, and where she with the child commenced living with her parents.

J.S. testified at trial that he did not consent to the child being removed; and he did not know his wife and the child were going away; he came home after work one day and they were gone.

M.S. testified that she told J.S. she was taking the child and returning to New Jersey.

On August 21, 1990, the Superior Court, Chancery Division, Family Part, Hudson County under Docket # FD–09–691–91, awarded M.S. custody of the child; despite notice, J.S. did not appear at the hearing. On March 8, 1991, J.S. filed for a divorce in Florida; and on May 16, 1991, M.S. filed for a divorce in New Jersey. In his divorce complaint, J.S. requested an order that his wife continue as the residential parent, that he receive liberal visitation including alternate holidays and the summer months, and that the parties share in the support of the child.

In M.S.'s divorce complaint, she cited as extreme cruelty her husband's failure to support herself and the child since March 23, 1990, when she left for New Jersey, and asked for custody of the child, restraint of her husband from visiting the child and removing the child from New Jersey until further order of the court, and for alimony and child support. On July 1, 1992, the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, granted a divorce pursuant to J.S.'s application, during which proceedings J.S. was represented by an attorney. The divorce judgment, without mentioning child custody, support, or visitation, dissolves the bonds of marriage between the couple and goes on to recite: "That this Court specifically retains jurisdiction as to all other matters contained in the Petition for Dissolution of Marriage."

By order dated August 14, 1992, M.S.'s complaint for divorce was dismissed pursuant to the final judgment of divorce entered in Florida, and visitations for J.S. and the child with a court-ordered supervisor at the courthouse were ordered: two visitations for the week of September 7, and on September 14 and 15. The order further stated that the day after the last visit, the child, without J.S. being present, was to be brought to the supervisor for an evaluation of the visits, and later that same day both parents and their attorneys were to conference with the court to evaluate the visitation, and discuss future visitation.

On February 5, 1994, M.S. married R.K. and he became the stepfather of the child he now seeks to adopt. In November 1994, a daughter was born to M.S. and R.K.

R.K.'s adoption petition was filed August 30, 1994. J.S., having been duly given notice of the adoption in accordance with *N.J.S.A.* 9:3–45, made his objections known to the court in accordance with *N.J.S.A.* 9:3–46. He filed a certification in October 1994 stating his former wife, M.S., had thwarted his efforts to have a relationship with the child, and that he did not know she was getting a divorce until she had been out of the state of Florida over six months by which time his right to bring her back to Florida had elapsed.

An order issued July 25, 1995, pursuant to the adoption petition, stated that R.K. through his expert could submit a preliminary evaluation to the court and to J.S.; and that J.S. could retain his own expert. In 1995 the child, her mother, and stepfather were evaluated by a psychologist, Gerard Costa, Ph.D., who in his report of November 15, 1995, and as a trial witness, recommended the adoption as being in the child's best interests. Dr. Costa also testified at trial that he unsuccessfully attempted to evaluate J.S., who in turn testified that he did not want to come to New Jersey just to be evaluated; nor did he retain his own expert in Florida.

On February 13, 1996, a case management conference was held in chambers, attended by the attorneys for R.K. and J.S., respectively. As a result of that session, the court issued a case management memorandum dated February 14, 1996, which stated: that it appeared that J.S. was interested in pursuing a relationship with his daughter and at the present time did not want to have his parental rights terminated; that the court's suggestion, as based on the representation of J.S.'s attorney that her client had no objection thereto, was that the child's surname be changed to that of her stepfather; that M.S. pursue a URESA application for support; that the court order visitation for J.S. and the child; that the adoption be suspended pending a determination of how visitation and support worked out; that R.K.'s attorney would speak to

her client; that if he was not in agreement with the court's suggestions, perhaps the matter should be listed for an involuntary termination hearing.

Subsequently the parties prepared for trial, which took place during three days in November and December of 1996. Dr. Gerard Costa, R.K., M.S., J.S., and J.O., M.S.'s father, testified.

In addition, the court interviewed the child in chambers in the presence of the attorneys. The child told the court that her stepfather had come to court to try to adopt her, that she knew what adoption meant, and she wanted to be adopted by her stepfather and be known under his name. She said that she knew that J.S., whom she addressed by his first name, was her father; she had no memories of him. She added that R.K. was her "Daddy". The child impressed the court as a well-adjusted youngster, secure and happy with her school, friends, and present family.

## II

A judgment of adoption cannot be entered over the objection of a parent unless the court finds that the parent has substantially failed to perform the regular and expected parental functions of care and support. *N.J.S.A.* 9:3–46a. Such a determination is bound to be heavily fact-oriented. *See Matter of Adoption of a Child by D.M.H.*, 135 *N.J.* 473, 482, 641 *A.*2d 235 (1994). Accordingly, the following is a breakdown of the pertinent evidence relating to J.S.'s relationship to the child.

*Support*

On August 8, 1990, M.S. filed a URESA complaint, Docket No. FD–09–2656–91, seeking $50 a week in child support. At some point after that, J.S. sent M.S. a check and she returned it saying URESA was handling the support matter. The URESA complaint was eventually dismissed without J.S., as he testified, ever receiving notice of it, though his address and phone had not changed since his marriage to M.S.

Introduced into evidence was a letter, which J.S. knew of, dated July 28, 1992, from M.S.'s attorney to J.S.'s Florida attorney, asking for child support payments of $75 a week and medical insurance for the child. J.S. provided no explanation for why he did not respond to the letter except to say that he believed his attorney was handling his actions. J.S. testified he did not know why support was not addressed by his attorney during the divorce proceedings. Except for two checks for $200, each sent in 1992 and 1993 respectively, J.S. apparently paid no child support. J.S. seemed to suggest he sent more than the $400 M.S. testified to; however, he adduced no proof of such.

J.S. said that he did not send more money because his one check was returned. He also sent the child $500 to $600 worth of gift certificates from a national chain of toy stores, and a few gifts consisting of clothes, and Mini Mouse and Barbie dolls during the 1991–1992 period. Furthermore, he sent the child a gift every year for her birthday and Christmas until 1995. He said that when M.S. once asked him for money he sent it to her. She never supplied him with the child's medical bills.

J.S. testified he has not made any financial provision for the child, such as putting monies aside. He stated on the stand that if the adoption was not granted, he would be willing to pay the accumulated child support arrears of $15,000 that would have accrued if URESA had been enforced, and regular child support, calculated pursuant to the child support guidelines; if the court deemed it necessary he would obtain medical insurance for the child; and he would be willing to get life insurance naming the child as beneficiary and contribute to school and day care fees.

*Insurance*

In Florida, M.S. and the child had been covered by J.S.'s medical policy from his employment. Within a month of their departure, J.S. cancelled the insurance for both M.S. and the child, ending coverage for them on May 31, 1990. At trial J.S. testified that his insurance would not cover M.S. and the child out of Florida. But he did acknowledge that his policy would cover out

of Florida life threatening illness or emergency or urgently needed care and that he knew that the child at that time was not covered by any other medical insurance policy. J.S. also testified he did not have his then wife and child brought back because he did not know their departure was permanent until July or August of 1990, which indicates that when he cancelled the insurance he reasonably anticipated they would be returning to Florida.

The child was not covered by medical insurance again until May 1991, when her mother obtained insurance through her employment; then at a certain point when her mother ceased employment the child ceased to be covered. The child is presently not medically insured as her mother does not work and her stepfather's insurance does not cover a stepchild; however, his insurance will cover her if she becomes his adopted child.

*Visitation*

Since the child was removed from Florida, J.S. has seen her twice, when in 1992 he came to New Jersey pursuant to divorce proceedings initiated by M.S.

J.S. testified he arranged to come see the child in March or April of 1990, and purchased plane tickets. When he called M.S., he was told it was not convenient for him to visit and he should wait. He also testified that she told him any visit would have to be supervised and he was willing that it be so. J.S. testified that he had made many attempts to contact the child and to arrange visitation but was not allowed to reach her; and at a certain point he was told not to contact mother or child except through M.S.'s attorney. M.S. denied she told him all communication had to be through her attorney, and that she had denied him access to the child. In any case, J.S. did not contact M.S.'s attorney to ask for visitation.

J.S. also said he talked to M.S.'s parents frequently in 1990 regarding visitation but, J.O., M.S.'s father, denied the communication was frequent. J.S. also said that when he called after the child's first birthday seeking visitation, he was told to come after

J.O. had retired so that the latter could supervise the visit. J.O. denied this; and J.S. admitted he did not after this conversation ascertain when J.O. was retiring.

M.S. denied she refused J.S. visitation and stated she was willing to permit visitation as long as it took place in New Jersey. She testified the only time he requested visitation was when he wanted to take the child out of state once to visit his mother and father who were residing in Virginia and Washington, D.C., respectively, and she would not allow it. On August 21, 1990, M.S. was awarded custody of the child until further order of the court. J.S. was noticed but did not appear for the hearing, nor did he retain an attorney to represent him.

Pursuant to the divorce proceeding initiated by M.S. in 1992, J.S. came to New Jersey and enjoyed two court ordered supervised visitations in accordance with the August 14, 1992 order. One visit was supervised by the court-ordered psychologist, the other by J.O. During the two visits, J.S. was not allowed by the court supervisor to tell the child he was her father; and was introduced by his first name only. On the day the third visit was to take place, M.S. did not bring the child. She gave as her reasons that she took the child to the circus that day and that the visit was ordered by the court appointed supervisor and not the judge, though the order itself does indicate otherwise. None of the court-ordered evaluations regarding the visitation took place. J.S. returned to Florida and since then has not made any legal application within the New Jersey courts, attempted to enforce the Florida divorce judgment, or engaged in any self-help efforts in regard to visitation. He testified he called the court appointed supervisor after his return but nothing came of it; and he did not file any petition for visitation since the adoption complaint was filed, because he did not know the process would take as long as it has and because he was told not to call his ex-wife and her husband during the pendency of this litigation.

J.S. said that M.S. called him once in six years. He said that he desisted after many attempts to contact the child; that M.S. put

up roadblocks to block his access to the child; that he never got an opportunity to bond with the child; and he did not come to New Jersey after the court ordered visitation because previous experience had taught him that, if he came, he would not be able to see the child.

J.S. testified he was hurt that the child called plaintiff daddy but had no objection to her surname being the same as her stepfather's; he expressed a desire to visit her and for his family to know her; a willingness to have visitations supervised; and to undergo therapy if ordered by the court.

*Ability of natural parent*

Since his divorce, J.S. has not remarried and lives as a single man with no dependents, no person for whom he acts as primary caretaker, and no other children except for the child in this case. As a result of raises and promotions at work, J.S.'s yearly salary increased from a gross of approximately $23,000 in 1991 to a gross of $32,000 in 1996. He testified that his current budget, consisting of these monthly expenditures: $400 rent, $325 food, $75 clothes, $85 electric and gas, $50 beer and wine, $60 tobacco, $175 entertainment, $70 dry cleaning, $25 gifts, $15 medical, $20 hair cuts, and $70 vacations, is pretty close to what he has been experiencing for the past five years. He lives in the same apartment he and M.S. shared as a married couple and has not had a rent increase. His net monthly income is $1,694; and he enjoys $326 a month above the costs of his lifestyle. He stated that he has no pension to which he contributes, automobile or boat. He does maintain about $2,000 in a savings account, $2,000 in a checking account and $4,000 in an IRA.

J.S. stated that he enjoyed good health and has never been a drug addict or alcoholic.

## III

Effective April 27, 1994, *N.J.S.A.* 9:3–46. *Objection by parent; prohibition of judgment of adoption; exception; guardian or*

*person standing in loco parentis; notice and standing to object,* and *N.J.S.A.* 9:3–48. *Action on complaint for adoption; child not received from approved agency,* were amended. This case is decided under the amended statutes, utilizing the prior case law as an interpretive aid, as there is as yet no case law regarding the amended statutes.

As a general proposition, applicable to all adoption proceedings, *N.J.S.A.* 9:3–46a provides that a judgment of adoption shall not be entered over an objection of a parent unless the court finds:

(1) that the parent has substantially failed to perform the regular and expected parental functions of care and support of the child although able to do so, or (2) that the parent is unable to perform the regular and expected parental functions of care and support of the child and that the parent's inability to perform those functions is unlikely to change in the immediate future.

The regular and expected functions of care and support of a child shall include the following:

(a) the maintenance of a relationship with the child such that the child perceives the person as his parent

(b) communicating with the child or person having legal custody of the child and visiting the child unless visitation is impossible because of the parent's confinement in an institution, or unless prevented from so doing by the custodial parent or other custodian of the child or a social service agency over the birth parent's objection; or

(c) providing financial support for the child unless prevented from doing so by the custodial parent or other custodian of the child or a social service agency.

A parent shall be presumed to have failed to perform the regular and expected parental functions of care and support of the child if the court finds that the situation set forth in paragraph (1) or (2) has occurred for six or more months.

The prior provision of *N.J.S.A.* 9:3–46 stated that no judgment of adoption shall be entered over the objections of a parent unless the court finds

that the parent has substantially failed to perform the regular and expected parental functions of care and support of the child, which shall include maintenance of an emotional relationship with the child.

The amendments tend to reduce the discretion of the court in deciding what are the "regular and expected parental functions of care and support", by listing three factors to be looked for in making such decisions, along with a time limitation of six months. In addition, the nebulous "maintenance of an emotional relation-

ship with the child" which could have a great many meanings, all of them burdensome for a court to gauge, has been changed to a clearer, specific, and quantifiable standard of requiring merely that the child perceive someone as the parent, without any stipulations as to the context of that perception. In the amended statute, the Legislature intended to provide a standard of decision more objective and specific than that provided by the previous statute.

Similarly, in the context of a nonapproved agency adoption, *N.J.S.A.* 9:3–48c(1) provides that if the court finds that the parents of a child do not have rights as to custody of the child by reason of

their substantial failure to perform the regular and expected parental functions of care and support of the child, although able to do so, or their inability to perform these functions which is unlikely to change in the immediate future;

the court shall terminate parental rights.

The prior provisions of *N.J.S.A.* 9:3–48c(1) set the standard for termination of parental rights as

intentional abandonment or very substantial neglect of parental duties without a reasonable expectation of a reversal of that conduct in the future.

The amended law, by changing "intentional abandonment or very substantial neglect" to "substantial failure to perform the regular and expected" denotes a standard that is more objective and less subjective for a court to employ in finding the factors required to terminate parental rights. That a parent took the extreme posture of actual abandonment or neglect is no longer required for termination of rights. Furthermore, the change from the prior law's "future" to the present law's "immediate future", shortens the time period during which a parent could be expected to alter his or her conduct.

## IV

The amendments to New Jersey's adoption laws do not alter the fundamental concerns that bear upon the question of whether parental rights should be terminated. All such inquiries must be considered in light of the extraordinarily strong protec-

tions that surround those rights. The right of a biological parent to enjoy a relationship with his or her child is fundamental and constitutionally protected. *Stanley v. Illinois,* 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.*2d 551 (1972); *In re Adoption of Children by L.A.S.,* 134 *N.J.* 127, 631 *A.*2d 928 (1993). Accordingly, strict standards must be satisfied before a parent's rights will be terminated. *Santosky v. Kramer,* 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599 (1982); *In the Matter of the Guardianship of J.C.,* 129 *N.J.* 1, 608 *A.*2d 1312 (1992).

The instinctive and constitutional right to a relationship with one's child is not absolute; the parent must demonstrate a commitment to the responsibilities of parenthood. *Lehr v. Robertson,* 463 *U.S.* 248, 258–262, 103 *S.Ct.* 2985, 2991–94, 77 *L.Ed.*2d 614 (1983). Determining the appropriate level of commitment is a weighty matter, the importance of which cannot be overstated; for the stark fact is the court is deciding whether a natural father will be deprived of the right to ever see his child again. Such a decision calls for the utmost judicial caution. Termination of a parent's rights is an extraordinary judicial remedy which will be granted only after intensive consideration of parental misconduct and, if appropriate, the welfare of the child. *In the Matter of the Adoption of Two Children by J.J.P.,* 175 *N.J.Super.* 420, 426, 419 *A.*2d 1135 (App.Div.1980).

In order to terminate a parent's rights, clear and convincing evidence of the statutory criteria must be presented. *New Jersey D.Y.F.S. v. A.W.,* 103 *N.J.* 591, 612, 512 *A.*2d 438 (1986); *In the Matter of the Adoption of a Child by J.R.D.,* 246 *N.J.Super.* 619, 627, 588 *A.*2d 446 (Ch.Div.1990).

Despite the differences in the respective statutory descriptions of the conditions required to terminate parental rights and grant an adoption over a parent's objection, the prior law of *N.J.S.A.* 9:3–48 and *N.J.S.A.* 9:3–46a have been found to be appreciably equivalent to one another. *In the Matter of Baby M,* 109 *N.J.* 396, 444–45, 537 *A.*2d 1227 (1988); *In the Matter of the Adoption of Children by L.A.S.* 134 *N.J.* 127, 134, 631 *A.*2d 928 (1993).

■ Essentially two grounds justify the termination of parental rights; one is abandonment and the other, unfitness. *L.A.S., supra,* 134 *N.J.* at 134, 631 *A.*2d 928; *J.R.D., supra,* 246 *N.J.Super.* at 628, 588 *A.*2d 446. These grounds are often not clearly differentiated. *See J.R.D., supra,* 246 *N.J.Super.* at 628, 588 *A.*2d 446. Unfitness often involves "very substantial neglect of parental duties" and that the parent's failings have actually harmed the child or threaten imminent harm. *L.A.S., supra,* 134 *N.J.* at 135, 631 *A.*2d 928. In this case, no harm to the child is alleged. The court therefore will examine how the issue of abandonment was treated in earlier cases.

■ It is true, as noted above, that the amended statutes make it clear that neither abandonment or neglect must be found in order to terminate parental rights. Despite the differences between the amended and the previous law, however, the cases decided under the previous law can still guide the court in determining what factors bear upon the termination of parental rights.

■ Satisfying the statutory prerequisite of intentional abandonment under the prior law required a state of mind that indicates the willful or purposeful repudiation of parental responsibilities, although physically and financially able to discharge those obligations. *L.A.S., supra,* 134 *N.J.* at 134–135, 631 *A.*2d 928; *D.M.H., supra,* 135 *N.J.* at 481, 641 *A.*2d 235. The biological parent must have engaged in a course of conduct that evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child. *L.A.S., supra,* 134 *N.J.* at 135, 631 *A.*2d 928. The amended law is obviously intended to obviate the need for determining a parent's state of mind or settled purpose.

Under the prior law of *N.J.S.A.* 9:3–48c(1), in a stepfather adoption case, a natural father who saw his daughter once in six years and paid child support intermittently was found not to have intentionally abandoned or substantially neglected her, because his failure to attempt to visit her was more attributable to debilitating

alcoholism than evasion of responsibility. *J.R.D.*, *supra*, 246 *N.J.Super.* at 629, 588 *A.*2d 446.

In *J.J.P.*, *supra*, 175 *N.J.Super.* 420, 419 *A.*2d 1135, also a stepfather adoption case, the defendant pursued visitation, paid child support, maintained insurance policies and savings plans for his children, and named them as beneficiaries in his will. The Appellate Division stated there was no evidence that the defendant had abandoned or substantially neglected his children; that although defendant could have pursued his right to develop a relationship with his children more vigorously, it is beyond dispute that he was frustrated in his attempts by his ex-wife; and that his continued financial support and concern for the economic future of his children and his vigorous contestation of the adoption showed that any previous conduct indicating less than vigorous pursuit of his parental rights had been reversed. *Id.* at 428, 419 *A.*2d 1135.

The prior statutory language of *N.J.S.A.* 9:3–48c(1) stems from an earlier stepfather adoption case, *In the Matter of the Adoption of Children by D*, 61 *N.J.* 89, 293 *A.*2d 171 (1972), in which the court construed the then statute to mean "intentional abandonment or very substantial neglect of both parental duties and claims, with no reasonable expectation of any reversal of that conduct in the near future." *Id.* at 94, 293 *A.*2d 171. There, the parents were divorced and the natural father had been in jail. Upon his release he visited the children frequently, as did his parents; when the mother of the children refused to accept child support payments, the father deposited the sums into a bank account. The court decided the facts did not justify the termination of parental rights. *Id.* at 98, 293 *A.*2d 171.

Incarceration for a period of thirty years has been held to be sufficient to terminate parental rights in a case where the child's maternal aunt sought custody. *In the Matter of the Adoption of a Child by Celeste Benigno–White*, 223 *N.J.Super.* 72, 78, 537 *A.*2d 1345 (Ch.Div.1987). In *L.A.S.*, *supra*, 134 *N.J.* at 143, 631 *A.*2d 928, the court concluded a parent's lengthy incarceration was a material factor bearing on whether parental rights should be

terminated; and that the nature of the underlying crime giving rise to incarceration and the circumstances thereof should also be considered, because they could bear on the issue on unfitness or abandonment.

Plaintiff has attempted to make a case that adoption would be in the best interest of the child. But the applicable principle of law elevates the natural parent's rights slightly higher than the child's. *J.R.D., supra,* 246 *N.J.Super.* at 627, 588 *A.*2d 446; *Baby M, supra,* 109 *N.J.* at 447–452, 537 *A.*2d 1227. The statutory law does not include the best interests of the child as a factor in deciding whether or not to terminate a parent's rights.

## V

The court finds by clear and convincing evidence that J.S. has substantially failed to perform the regular and expected parental functions of care and support of the child, although able to do so for six or more months, *N.J.S.A.* 9:3–46a; 9:3–48c. J.S. did not maintain a relationship with the child such that she reasonably perceived him to be her parent; nor did he maintain a mode of communication on a reasonable periodic basis with the child or the person having legal custody of the child, or establish a pattern of visitation with the child; nor did he provide financial support for the child or set aside a reserve fund for the contingency of child support.

The court does not doubt that J.S. is genuinely interested in forming a relationship with his child, or that he has affection for her. But the court's findings cannot depend on his subjective intent. The court is also aware that J.S. was in a particularly difficult situation. When she was but a few months old, before father and child were able to know each other, the child was taken from Florida where her father was to New Jersey, many hundreds of miles away. In addition, the custodian of the child, M.S., was not particularly willing to allow him contact with the child, as evidenced by her divorce complaint which made no mention of visitation.

However, there is no indication that if J.S. had actively sought contact with the child, he would have been prohibited from seeing her. In his testimony, J.S. did not recall any specific time he asked for visitation, apart from the 1992 court-ordered visitation, except on two occasions: first, when he was told he would be able to visit after M.S.'s father retired; and second, when he arranged to come to New Jersey with the intent of taking the child, who at that time was still an infant, out of state. J.S. stated he did nothing more in regard to visitation because he felt he would not have been allowed to visit the child. But the court order pursuant to M.S.'s divorce complaint and the court's case management memorandum of February 14, 1996, pursuant to the adoption, show that he could have, with judicial approval, pursued visitation with his child. Moreover, the Florida divorce judgment provided yet another avenue through which J.S. could have attempted visitation. Though making no mention of visitation or child support, that judgment specifically retained jurisdiction of all matters contained in J.S.'s divorce petition, in which petition visitation was requested.

J.S. enjoyed two court-ordered supervised visitations with his child; and the fact that the third visit was cancelled by M.S. did not deprive J.S. of his ability and opportunity to seek further contact with the child. By failing to follow up visitation at that time, or at a later time when the court issued its memorandum a year ago on February 14, 1996, stating it would order visitation, or in regard to the divorce judgment, J.S. missed an opportunity to demonstrate his commitment to parenthood. In addition, J.S. did not take any steps to bring M.S. from New Jersey back to Florida.

In regard to communicating with the person having custody of the child, J.S. did not establish that he regularly called or wrote M.S. to inquire after the child and that she refused to communicate with him. For her part, M.S. twice unsuccessfully attempted to gain child support from J.S.

In regard to financial support, J.S. sent gifts and certificates for toys twice a year for a few years. The only monies provided were

two $200 checks; the one other check he sent to M.S. was returned uncashed. The fact that M.S. returned one of his checks does not mean he could not have pursued the issue of support. But he did not. At no time did he address the issue of child support, put aside money for the child, take out insurance with her named as beneficiary, obtain health insurance for her, or perform any other act that would tend to show responsibility for the child's well-being. Indeed, soon after the child and her mother left Florida, he cancelled the child's medical insurance.

Throughout the divorce and the adoption proceedings, J.S. was represented by counsel. At no time has J.S. pleaded poverty, illness, or psychiatric or psychological disability as a reason he was not able to visit, support, or otherwise fulfill his obligations towards his child. The court is satisfied that he had the financial and mental capacity and legal ability to perform parental functions and that he failed to do so.

For all the foregoing reasons, the court finds by clear and convincing evidence that J.S.'s parental rights are terminated for all purposes.