704 A.2d 604

IN THE MATTER OF THE ADOPTION
OF A CHILD BY F.O. AND W.O.

Superior Court of New Jersey
Chancery Division
Family Part
Hudson County

Decided October 8, 1997.

*Barry Berman,* for plaintiffs F.O. and W.O.

*Shelley Albert*, for defendant A.Z.

HUNTER, J.S.C.

This is a contested adoption case that requires the court to determine whether a biological father's parental rights should be terminated in order to permit the foster parents to adopt the child, where the natural father was incarcerated for virtually the entire first 10 years of the child's life and has made very little effort since his release to perform his statutorily required parental duties.

I.

The child, M.Z., was born in Miami, Florida on September 7, 1984 to the father, A.Z., and the mother, S.Z. Although the parents used the same surname, they were not legally married at any point before or after M.Z. was born. When the child was approximately three weeks old, S.Z. was visiting a friend and told her that she and A.Z. had to go on a lengthy trip to take care of an "emergency" and asked if she could leave the baby with her. Her friend stated that she could not care for the child, so S.Z. then asked the friend's house guests, F.O. and W.O., to care for the child. Mr. and Mrs. O., who have at all relevant times been New Jersey residents, were staying in Florida with S.Z.'s friend but they had never met S.Z. before this occasion. Although they thought it was strange that a parent would ask a virtual stranger to care for her child for an extended period of time, the couple agreed to look after M.Z.

After two weeks passed and they did not hear from either parent, Mr. and Mrs. O. received a phone call informing them that both parents had been arrested in Oklahoma and charged with drug trafficking. Both were subsequently convicted and sentenced to terms in federal prison. Mr. and Mrs. O. retained physical custody of M.Z. and have cared and provided for him ever since that time. Shortly after learning that M.Z.'s biological parents were incarcerated, they contacted the Division of Youth

and Family Services to obtain rights to the child and received legal custody through an order dated May 10, 1985.

Neither parent saw the child while they were incarcerated and both had little or no communication with their son through telephone calls or the mails. During his incarceration, A.Z. had little contact with his son, speaking with him on the telephone infrequently and several times the father and son corresponded through letters. He apparently inquired into his son's well being and progress when he talked on the phone with Mr. and Mrs. O. or their daughter, M.O., with whom he had a close friendship. He never saw the child during this time, as neither the child nor Mr. and Mrs. O. ever visited him in prison. As for S.Z., she has not seen the child since he was three weeks old. Following her release from prison in 1989, she contacted Mr. and Mrs. O. and told them that she was not capable of caring for M.Z. and wanted him to remain in their custody. Since that time, A.Z. has not attempted to contact M.Z. and she has not voiced any objection to the proposed adoption.

Upon his release from prison in 1992, A.Z. went to live with Mr. and Mrs. O. in New Jersey. He apparently had no other family or friends with whom he could stay. He lived rent-free in their home for approximately two months before he abruptly picked up and left for Florida without informing Mr. and Mrs. O. or M.Z. that he was leaving or where he was going. Mr. and Mrs. O. and M.Z. were surprised by his hasty departure and worried for his safety. While in Florida, A.Z. was arrested for a parole violation and sent back to prison for 10 months. During this time he did not contact Mr. and Mrs. O. to inform them of his whereabouts or attempt to contact his son.

In November 1994, A.Z. was released from prison to a halfway house where he stayed for three months. He continued to live in Florida after he was released. He says he found it difficult to find work, but eventually obtained a license to wash trucks and started a mobile truck cleaning business. Additionally, upon being released from the halfway house A.Z. began living with Mr. and

Mrs. O.'s daughter, M.O., with whom he had become romantically involved. They were married in 1995 and settled in Miami, Florida. They subsequently had a child of their own in 1996 and are in frequent telephone contact with Mr. and Mrs. O.

A.Z. did not visit his son during the years 1993 through 1995 and only since his marriage to Mr. and Mrs. O.'s daughter in late 1995 has he begun to have more contact with the child. A.Z. has seen M.Z. approximately four times in the last two years, twice when Mr. and Mrs. O. came to visit the couple in Florida (bringing the child with them) and twice when the couple visited Mr. and Mrs. O. in New Jersey. A.Z. paid no money to finance the child's transportation costs for these trips to Florida and, indeed, he has paid absolutely no child support for the entire period during and after his incarceration. The only items he has provided on behalf of the child are some clothing, a bicycle, and partial payments towards a bed Mr. and Mrs. O. bought for M.Z. In August 1997, Mr. and Mrs. O. and M.Z. spent a month with A.Z. and his wife in Florida, with the child staying an additional 10 days after his foster parents returned to New Jersey. This 10-day separation is the longest period of time M.Z. has been separated from Mr. and Mrs. O. since he was first placed in their care by his biological mother in 1984.

Mr. and Mrs. O. filed a petition for adoption on December 2, 1992. A.Z. was notified of the pending adoption pursuant to *N.J.S.A.* 9:3-45 and he objected to it in accordance with *N.J.S.A.* 9:3-46 by his response to the court dated January 29, 1993. He informed the court that he did not want his parental rights to be terminated and was capable of satisfying his duties and obligations as a parent. The court was therefore required to inquire into A.Z.'s parental status before it could act on the adoption proceeding.

## II.

A parent's relationship with his or her child is considered to be a fundamental interest and is constitutionally protected, so

that parental rights can be terminated only in extraordinary circumstances. *Santosky v. Kramer,* 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.2d* 599 (1982); *Stanley v. Illinois,* 405 *U.S.* 645, 92 *S.Ct.* 1208, 31 *L.Ed.2d* 551 (1972); *New Jersey Div. of Youth & Family Services v. A.W.,* 103 *N.J.* 591, 512 *A.2d* 438 (1986); *In re Adoption of Children by L.A.S.,* 134 *N.J.* 127, 631 *A.2d* 928 (1993). This instinctive and constitutional right is not absolute, however. A biological relationship, by itself, "does not create a protected interest in the parent in the absence of a demonstrated commitment to the responsibilities of parenthood; a natural parent who does not come forward and seek a role in the child's life has no constitutionally protected relationship." *Lehr v. Robertson,* 463 *U.S.* 248, 258–262, 103 *S.Ct.* 2985, 2991–2993, 77 *L.Ed.2d* 614, 624–627 (1983).

■ A judgment of adoption cannot be entered over the objection of a parent unless the court finds that the objecting parent has failed to perform his or her parental duties. If such a failure occurs, the court is authorized to terminate that person's parental rights and permit the adoption to proceed. Under New Jersey law, the termination of parental rights in the context of a contested adoption is governed by *N.J.S.A.* 9:3–46a, which states that a (natural) parent is entitled to object to the adoption of his or her child *unless* the court finds:

(1) that the parent has *substantially failed* to perform the regular and expected parental functions of care and support of the child *although able to do so,* or (2) that the parent is unable to perform the regular and expected parental functions of care and support of the child and that the parent's inability to perform these functions is unlikely to change in the immediate future.

The adoption statute was amended in 1994 to include specific criteria that the courts must apply in determining whether a parent has satisfied the regular and expected functions of care and support of a child. These criteria are:

(a) the maintenance of a relationship such that the child perceives the person as his parent;

(b) communicating with the child or person having legal custody of the child and visiting the child unless visitation is impossible because of the parent's confinement in an institution, or unless prevented from doing so by the custodial parent or other

custodian of the child or a social service agency over the birth parent's objection; or

(c) providing financial support for the child unless prevented from doing so by the custodial parent or other custodian of the child or a social service agency. *N.J.S.A.* 9:3–46a.

■ The statute says that a parent is presumed to have failed to provide support if such a condition has occurred for a period of six months or more. *Id.* In order to terminate a parent's rights, clear and convincing evidence of the statutory criteria must be demonstrated. *New Jersey D.Y.F.S. v. A.W.*, 103 *N.J.* 591, 612, 512 *A.*2d 438 (1986); *In the Matter of the Adoption of a Child by R.K.*, 303 *N.J.Super.* 182, 195, 696 *A.*2d 116 (1997). If such a showing is made, the court shall enter an order terminating that individual's parental rights pursuant to *N.J.S.A.* 9:3–48c(1).

■ Prior cases interpreted the adoption statute as requiring willful and purposeful conduct on the part of the parent in order to establish abandonment or substantial neglect. *In the Matter of the Guardianship of J.C., J.C., and J.M.C., Minors*, 129 *N.J.* 1, 17, 608 *A.*2d 1312 (1992). The purpose of the amendments to the statute are to make the inquiry into the parent's duties much more objective, thus obviating a need for a searching inquiry into the parent's subjective limitations. To terminate parental rights, now the court need only find that the parent failed to substantially perform the aforementioned parental duties, rather than demonstrate the highly subjective criteria set up by the previous statute, "intentional abandonment or very substantial neglect." *R.K.*, 303 *N.J.Super.* at 194, 696 *A.*2d 116. The overall effect of the amendments is that it is now much easier for the court to terminate an individual's parental rights than in the past because the court need only weigh the statutory criteria and need not inquire into whether the parent possessed the actual intent to abandon or neglect. *Id.*[1]

---

[1] *In re Adoption of a Child by J.R.D.*, 246 *N.J.Super.*, 619, 588 *A.*2d 446 (1990), the court held that a father's parental rights should not be terminated where the father's lack of contact with the child and disinterestedness in parenting was

 Applying the statutory criteria to this case, the court finds by clear and convincing evidence that A.Z. has failed to substantially fulfill his expected parental functions for a period exceeding six months (namely since his release from prison in 1994) and, therefore, his parental rights should be terminated. Also, because he has failed to show a demonstrated commitment to parenthood he has no constitutionally protected parent-child relationship. *See Lehr, supra.* This action opens the door for Mr. and Mrs. O. to proceed with their adoption of the child.

Although M.Z. knows that A.Z. is his biological father and calls him "poppy," he also views F.O. as his father and refers to him as "papa." It is unclear whether he really looks to A.Z. as a father, but it is very clear that he does see Mr. and Mrs. O. as his parents. While there is no conclusive evidence as to M.Z.'s impression concerning A.Z.'s role in his life, the fact that he calls two men "father" may provide some evidence that the natural father has not maintained a sufficient relationship with M.Z. such that the child perceives him to be his father.

 The defendant has only seen his son on approximately a half dozen occasions since the child was three weeks old. He was incarcerated for the majority of this time and parental abandonment cannot be established solely through a lack of physical contact and visitation with the child resulting from the parent's incarceration. *L.A.S.,* 134 *N.J.* at 137, 631 *A.*2d 928. Incarceration is a relevant factor to consider, however, in determining whether the parent-child relationship should be terminated. *Id.* at 138, 631 *A.*2d 928. The court should weigh the nature of the contact between the parent and child before and after the incarceration, what responsibility for the child the parent undertook

---

attributable mainly to the father's alcoholism. *Id.* at 629, 588 *A.*2d 446. The court said that the father did not intentionally abandon or neglect his child, so his rights could not be terminated under the statute. *Id.* Such a finding would not be acceptable under the revised statute because now it must only be shown that the parent substantially failed to perform his parental duties, not that he or she intended to abandon or neglect the child.

while incarcerated, and the efforts made by the parent to maintain contact with the child following his or her release. *Id.*

While A.Z. may have spoken infrequently with Mr. and Mrs. O. or their daughter about his son's activities while he was in prison, he hardly can be said to have maintained significant contact with him or undertaken any real responsibilities on his behalf. His general indifference toward his parental obligations has continued since his release from prison. It is most amply demonstrated by his unexpected and unannounced exit from Mr. and Mrs. O.'s household following his initial release from prison in 1992, being sent back to prison for a parole violation shortly thereafter,[2] and remaining in Florida following his re-release from prison in 1994. Even now A.Z. does not want to assume significant parental responsibility, as he is not seeking custody of M.Z. but instead only desires informal visitation. While the defendant's failure to seek custody is not dispositive in this case, it has been used in the past as one factor among many to consider when deciding whether to terminate parental rights. *In the Matter of an Adoption by D.M.H.*, 135 *N.J.* 473, 488–489, 641 *A.*2d 235 (1994).

A.Z. claims that he has communicated both pre- and post-incarceration with Mr. and Mrs. O. regarding child rearing decisions concerning M.Z. Since his release from prison, however, he has been nothing more than an intermittent presence in his son's life. The sincerity of his recently increased communication with his son is called into question by the fact that he is now married to Mr. and Mrs. O.'s daughter. A.Z. did not see the child at all for at least two years (1993–1995) and his contacts with Mr. and Mrs. O. during this time can be called sporadic at best. His participation in his son's life was virtually nonexistent until he married Mr. and Mrs. O.'s daughter in 1995. Now he accompanies his wife if they

---

[2] Some courts have determined that the commission of a crime is equivalent to intending the consequences of that crime, including imprisonment. *L.A.S.*, 134 *N.J.*, at 132, 631 *A.*2d 928 (1993). Therefore, under such a view a person would display a lack of intent to care for his or her children by committing a crime and being incarcerated.

visit her parents in New Jersey or sees M.Z. if the child accompanies Mr. and Mrs. O. on their trips to Florida. As a result, any increased contact he has had with M.Z. since his marriage can be seen as incident to his wife's desire to maintain close contact with her parents.

The finding that A.Z. has failed to substantially fulfill his parental duties is also bolstered by his demonstrated lack of effort in financially supporting the child. He has never at any time paid any child support to the foster parents and, apart from the $162 a month they receive in state assistance, all the costs of raising M.Z. have been borne by Mr. and Mrs. O. He also has never paid for the child's transportation costs when the family has come to visit he and his wife in Florida. At best, A.Z. has provided some clothes and a bicycle for M.Z. and given Mr. and Mrs. O. some money toward the costs of a bed. This is the extent of the provisions he has made for his son during his lifetime.

A.Z. says that Mr. and Mrs. O. have never asked for any child support, but a non-custodial parent's obligation to pay support is not dependent upon the custodial parents' diligence in pursuing it. He has earned $900 a month for the last year and at no time has he sent any portion of these earnings to New Jersey to help Mr. and Mrs. O. raise his son. While the defendant may be a man of modest means who has a new wife and child to support, this does not discharge his obligations to his elder child. Therefore, he can be said to have substantially failed to perform his regular and expected parental duties although able to do so.

### III.

In addition to the statutory basis for terminating A.Z.'s parental rights, this result is also furthered under a best interests of the child analysis. The termination of parental rights in order to facilitate an adoption must always be found to be in the child's best interests. *L.A.S.*, 134 *N.J.* at 134, 631 *A.*2d 928; *J.C.*, *supra*, 129 *N.J.* at 17, 608 *A.*2d 1312; *A.W.*, *supra*, 103 *N.J.* at 603, 512 *A.*2d 438. The termination of the defendant's rights will be

best for M.Z. here because it provides a permanent resolution of his status and adds some much needed stability to his life. Mr. and Mrs. O. first contemplated this adoption in 1987, and the petition for adoption was filed in 1992. The adoption, however, was put on hold in 1993, when A.Z. voiced his objection pursuant to *N.J.S.A.* 9:3-46.

When the benefit from the termination of parental rights outweighs any harm resulting from the severing of the relationship, such a termination should be granted by the court. *A.W.*, 103 *N.J.* at 610, 512 *A.*2d 438. The benefit from terminating parental rights in this case does outweigh any resulting harm. While the defendant may subjectively and honestly desire a closer and more meaningful relationship with his son, his objective behavior does not reflect this desire. He has provided no child support payments, has made no effort to reside geographically closer to his son since his release from prison, and has made virtually no financial provisions or other arrangements that would enable him to enjoy more consistent visitation and contact with M.Z.

In contrast to this distant relationship are the admirable efforts Mr. and Mrs. O. have already put forth in raising the child. By all indications, they will continue to provide M.Z. with care and affection in the future, so there is a strong likelihood that the child will find a more promising relationship as a result of having the natural father's rights terminated. A.Z., through both his past and present actions, has failed to prove either his desire or ability to provide for the child. Even now, he is not seeking custody or court-ordered visitation. When compared with Mr. and Mrs. O.'s already demonstrated ability and desire to care for M.Z., this termination of rights is correctly seen as being in the best interests of the child.

There is clearly a very strong bond between Mr. and Mrs. O. and the child, and the couple states that they consider him to be just as much their child as their biological children. The child's affection for his foster parents is also self-evident. Although he

wants to maintain a relationship with his natural father, he considers Mr. and Mrs. O. to be his parents. They have provided the guidance, support, and stability that have helped M.Z. to become the well-adjusted young man the court perceives him to be.

A child needs association with a nurturing adult and it is generally agreed that permanence is an important part of that nurture. *A.W.*, 103 *N.J.* at 610, 512 *A.*2d 438. The defendant's infrequent visits and scant contact with his son do not constitute a permanent and consistent father-son relationship. By terminating his rights and permitting the adoption to proceed, the court will be adding a measure of permanence and stability to his life. Additionally, as Mr. and Mrs. O. are in a better financial position to care and provide for the child, this action will lend financial stability for his future because it ensures the child inheritance rights from his foster parents. *N.J.S.A.* 9:3–50(b).

## IV.

In an adoption proceeding where the child sought to be adopted is 10 years of age or older, the court shall inquire into and consider the wishes of the child. *N.J.S.A.* 9:3–49. The court interviewed the child in chambers on September 17, 1997. M.Z. stated that he loves Mr. and Mrs. O., feels secure under their care, and considers them to be his parents. The court was impressed with the child's attitude and demeanor, as well as the ambitious aspirations and goals he expressed during the interview. He stated that he prefers to stay in New Jersey with Mr. and Mrs. O., but does want to continue a relationship and enjoy visitation with his natural father. The child stated that if the termination of A.Z.'s rights meant that he could not see his natural father anymore he was not in favor of the termination. When told that a termination of rights would not prohibit him from seeing his father, the child then said he had no objection to the adoption. He also did not object to a change in his name, as long as he is given a hyphenated last name consisting of the surnames of both Mr. and

Mrs. O. and A.Z. Therefore, the court can and does properly consider the child's willingness to let the adoption proceed in reaching this decision.

## V.

This case is unique, because although the court is called upon to determine whether A.Z.'s parental rights should be terminated, it is expected that he and the child will remain in contact. In fact, as he is married to the daughter of M.Z.'s prospective adoptive parents, it is likely he will have frequent opportunities to visit with and speak to the child. Notwithstanding these unusual circumstances, the court finds that the natural father's rights should be terminated because he has failed to satisfy the statutorily required parental functions, although he has been able to do so. Additionally, the court finds that the termination of the father's rights and the resulting adoption will further the best interests of the child, because it will substitute dedicated and proven care givers for an individual who has failed to provide for his child in the past and shows no real indication of doing so in the future.

For all the foregoing reasons, the court finds by clear and convincing evidence that A.Z.'s parental rights are terminated for all purposes.