706 A.2d 198

# IN THE MATTER OF THE ADOPTION
## OF A CHILD BY W.P. AND M.P.

Superior Court of New Jersey
Appellate Division

Submitted February 11, 1998—Decided February 13, 1998.

Before Judges BAIME, BROCHIN and WEFING.

*Elliot H. Gourvitz,* attorney for appellant T.S. (*Richard A. Outhwaite,* on the brief).

*MacFall, Reidl & Miskowski,* attorneys for respondents W.P. and M.P. (*James W. Miskowski,* of counsel and on the brief; *Harriet Dinigar Milks,* on the brief).

No briefs were submitted by respondents M.S. and K.S.

The opinion of the court was delivered by

BAIME, P.J.A.D.

This appeal is from a judgment terminating T.S.'s parental rights to his natural daughter, M.R. Although phrased in a variety of ways, T.S. contends that the Family Part's findings

relating to parental unfitness were not supported by clear and convincing evidence. We disagree.

## I.

We need not describe the procedural history in detail. T.S. and J.H. are the unmarried birth parents of M.R., who was born on August 11, 1994. After J.H. expressed her willingness to surrender her parental rights to M.R., the prospective adoptive parents filed a complaint for adoption. T.S. filed an objection to the adoption. His parents moved to intervene. Following the denial of their motion for intervention, T.S.'s parents filed an emergent appeal. We ordered the Family Part to proceed with a hearing respecting whether T.S.'s parental rights could be terminated over his objection. We directed that T.S.'s parents be afforded an opportunity to renew their application for intervention before consideration of other substantive issues relevant to custody, guardianship or adoption. Following a protracted hearing, the Family Part entered a judgment terminating T.S.'s parental rights. T.S. appealed. We now affirm.

The essential facts are not in dispute. T.S. and J.H. met in June of 1993. In December of that year, J.H. learned she was pregnant and so advised T.S. Although T.S. expressed interest in the prospect of becoming a father, he was heavily addicted to synthetic heroin, cocaine, marijuana and alcohol and was unemployed. T.S.'s problems with narcotics had begun in his early teenage years, and despite J.H.'s repeated entreaties, continued throughout their relationship. Moreover, T.S. had a substantial criminal record, having been convicted of several armed robberies and weapons offenses.

In February 1994, T.S. was incarcerated in the county jail. As a condition of his release, T.S. entered a drug treatment program. T.S. admitted to J.H. that he continued to use drugs while in that program, and that he found a way to circumvent the drug tests that were administered. After his completion of the rehabilitation program, T.S. was briefly employed, but used the money he

earned to purchase drugs and was fired. We add that T.S.'s employment history can fairly be characterized as negligible. T.S. was fired from six different jobs within a seven month period. T.S. never set aside any money for his daughter. Although J.H. worked until June of 1994, she ultimately found it necessary to receive welfare.

J.H. went into labor on August 10, 1994. Although T.S. agreed to drive J.H. to the hospital, he did not appear and was not present when the baby was born. He admitted the reason he was not present was because he was taking drugs. We note that the weekend before J.H. went into labor, T.S. had borrowed her car, but had never returned it. After the baby was born, the automobile was recovered, but it had been totally destroyed. J.H. and the baby resided with J.H.'s parents. When her parents were away, J.H. invited T.S. to spend a weekend with her in order to establish a relationship between him and the baby. When J.H. awoke the next morning, T.S. had left the house with her father's automobile in order to purchase drugs.

In September 1994, T.S. was incarcerated for a parole violation. Although professing to seek rehabilitation, T.S. chose to go to prison when offered the opportunity to enter a work therapy program. While incarcerated, T.S. repeatedly requested J.H. to visit him with their daughter. J.H. acceded to T.S.'s request on one occasion, but otherwise refused because she felt that the jail was not an appropriate atmosphere for child visitation. We digress to note that T.S. rarely sought to visit his daughter even when he was not incarcerated and able to do so. J.H. testified that M.R. did not recognize T.S. as her father.

While T.S. was in prison, J.H. decided to surrender her parental rights to M.R. Although T.S.'s parents had taken a keen interest in the child and had attended to her material needs, J.H. came to the conclusion that adoption was in the best interests of M.R. When she broached the subject, T.S. indicated in a letter that he would agree although he did not "want [his] daughter to be raised

by ... strangers." Upon his release from prison, however, T.S. expressed his dissatisfaction with the planned adoption.

The problem became more complicated upon T.S.'s subsequent arrest for breaking into his parents' home and stealing his father's guns. T.S.'s relationship with his parents had long been strained and volatile. T.S. had worked for his father for brief periods, but his drug addiction precluded continued employment. Upon T.S.'s latest arrest for theft of the weapons, his parents obtained a domestic violence order prohibiting any contact. On December 9, 1996, T.S. pled guilty to third degree theft. He was incarcerated at the time this appeal was filed.

Dr. Arlene Bruskin conducted a psychological evaluation of T.S. at the Family Part's request. She testified that T.S. was not functionally competent to act as a parent. According to Dr. Bruskin, T.S.'s "history of oppositional behavior manifested in drug abuse, school problems, antisocial actions, and frequent job changes" disclosed an underlying immaturity that would prevent him from raising M.R. without substantial risk. In her interview with T.S., he appeared "angry, defensive, deficient in empathy and preoccupied with issues of dependency [and] autonomy which relate[d] to his self esteem." The "test data suggest[ed]" that T.S. "overestimates his abilities" and that "his independent judgment [is] below average." The witness noted that T.S. intended to rely substantially on his parents' assistance if ultimately granted custody. She stressed, however, that T.S.'s volatile behavior would inevitably place him in conflict with his parents concerning issues of child care. Moreover, T.S.'s "unresolved emotional" problems would likely influence his discipline of M.R. as she matured. Dr. Bruskin added that T.S. was emotionally immature, his insight was poor, and his desire for stabilization solely through his own efforts appeared highly unrealistic.

The witness discounted the possibility that T.S. would improve if psychotherapy was provided. Dr. Bruskin noted that T.S. regarded psychotherapy as "witchcraft" and a "complete waste of time." T.S. confided to Dr. Bruskin that while in prison, he had attended

several therapy sessions in order to "look good" and further his chance of parole. However, his attitude and emotional state made him a poor candidate for rehabilitation.

The Family Part issued an extensive written opinion in which it found that T.S. was unfit to act in a parental role. In reaching this conclusion, the court determined that T.S. was "unable to perform the regular and expected parental functions of care and support," and that his incapacity was "unlikely to change in the immediate future." *N.J.S.A.* 9:3–46a(2).

## II.

 Parents have a constitutionally protected, fundamental liberty interest in raising their biological children. *Santosky v. Kramer,* 455 *U.S.* 745, 102 *S.Ct.* 1388, 71 *L.Ed.*2d 599 (1982). The Federal and State Constitutions protect the inviolability of the family unit. *Stanley v. Illinois,* 405 *U.S.* 645, 651, 92 *S.Ct.* 1208, 1212–13, 31 *L.Ed.*2d 551, 558–59 (1972); *New Jersey Div. of Youth and Family Serv. v. A.W.,* 103 *N.J.* 591, 599, 512 *A.*2d 438 (1986). The law's concept of the family "rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham v. J.R.,* 442 *U.S.* 584, 602, 99 *S.Ct.* 2493, 2504, 61 *L.Ed.*2d 101, 118 (1979). As is true of so many other legal presumptions, "experience and reality may rebut what the law accepts as a starting point." *Id.* 442 *U.S.* at 602, 99 *S.Ct.* at 2504, 61 *L.Ed.*2d at 119. The incidence of child abuse and neglect cases attests to the fact that some parents may act against the interests of their children. *Ibid.* Government "is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Id.* 442 *U.S.* at 603, 99 *S.Ct.* at 2504, 61 *L.Ed.*2d at 119 (citing *Wisconsin v. Yoder,* 406 *U.S.* 205, 230, 92 *S.Ct.* 1526, 1540, 32 *L.Ed.*2d 15, 33 (1972)). The State as *parens patriae* may act to protect children from serious physical and emotional harm. This may require a partial or complete severance of the parent-child relationship. However,

"[f]ew forms of state action are both so severe and so irreversible." *Santosky v. Kramer,* 455 *U.S.* at 759, 102 *S.Ct.* at 1398, 71 *L.Ed.*2d at 610.

When the child's biological parent resists termination of parental rights, our function is to decide whether the parent can raise the child without causing harm. *In re Guardianship of J.C.,* 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992). The cornerstone of our inquiry is not whether the parent is fit, but whether he can become fit to assume the parental role within time to meet the child's needs. *Ibid.* "The analysis of harm entails strict standards to protect the statutory and constitutional rights of the natural parents." *Ibid.* The burden rests on the party seeking to terminate parental rights "to demonstrate by clear and convincing evidence" that risk of "serious and lasting [future] harm to the child" is sufficiently great as to require severance of parental ties. *Ibid.*

The question focuses upon what course serves the "best interests" of the child. The law does not require ideal parents. The State has no roving commission to search for individuals who, by reason of temperament, wealth or situation, would better raise the child if afforded the opportunity. The issue instead, is whether, recognizing the frailties of humankind, the birth parent can substantially perform the regular and expected parental functions of care and support of the child.

That is the criterion expressly set forth in *N.J.S.A.* 9:3–46. That section provides that "[a] judgment of adoption shall not be entered over an objection of a parent ... unless the court finds:

(1) that the parent has substantially failed to perform the regular and expected parental functions of care and support of the child, although able to do so, or

(2) that the parent is unable to perform the regular and expected parental functions of care and support of the child and that the parent's inability to perform those functions is unlikely to change in the immediate future.

The regular and expected functions of care and support of a child shall include the following:

(a) the maintenance of a relationship with the child such that the child perceives the person as his parent;

(b) communicating with the child or person having legal custody of the child and visiting the child unless visitation is impossible because of the parent's confinement in an institution, or unless prevented from so doing by the custodial parent or other custodian of the child or a social service agency over the birth parent's objection; or

(c) providing financial support for the child unless prevented from doing so by the custodial parent or other custodian of the child or a social service agency.

A parent shall be presumed to have failed to perform the regular and expected parental functions of care and support of the child if the court finds that the situation set forth in paragraph (1) or (2) has occurred for six or more months."[1]

Although T.S.'s arguments are couched in terms of attacking the Family Part's factual findings, they are premised upon an interpretation of the statute with which we disagree. T.S. contends that termination of parental rights is impermissible in any case in which the parent is able to perform any one of the three "regular and expected parental functions of care and support of the child" listed in the statute even if he is unable to perform the other two parental functions specified. He asserts that the party seeking severance of parental ties must establish the parent's inability to perform all three of the "regular and expected parental functions of care and support of the child" listed in the statute.

■ T.S.'s interpretation of the statute is wholly at odds with the statutory language. The "regular and expected" parental functions listed by the statute are stated in the disjunctive. *See State v. Smith*, 262 *N.J.Super.* 487, 506, 621 *A.2d* 493 (App.Div.) ("[w]hen items in a list are joined by a comma or semicolon, with an 'or' preceding the last item, the items are disjunctive."), *certif. denied*, 134 *N.J.* 476, 634 *A.2d* 523 (1993). Further, the Legislature's use of the word "include" indicates that the list of "regular and expected" parental functions was not intended to be all-

---

[1] The Family Part rejected the adoptive parents' contention that T.S. had substantially failed to perform the regular and expected parental functions of care and support under *N.J.S.A.* 9:3–46a(1). We have no occasion to consider whether or not the court was correct in reaching this conclusion. Our disposition of the issues raised is confined to the Family Part's finding that T.S. is unable to perform the regular and expected parental functions of care and support under *N.J.S.A.* 9:3–46a(2).

inclusive. The statutory language clearly belies T.S.'s argument that each parental function listed is to be considered as a hermetically sealed watertight compartment without reference to the overall welfare of the child.

Moreover, T.S.'s construction of the statute defies common sense. Were we to adopt T.S.'s interpretation, the Family Part would be barred from severing parental ties where the person resisting termination is able to provide financial support, but unable to communicate with the child and maintain a relationship in which the child perceives the person as his parent. Similarly, a person able to communicate with the child, but unable to provide financial support and maintain a parental relationship could resist termination despite the clear and present danger posed to the child. And finally, a person able to maintain a parental relationship with a child, but unable to communicate or provide financial support would have an unbreakable right to raise the child regardless of the risk.

We read the statute consonant with the legislative purpose to prevent harm to the child for which there is "unambiguous and universal social condemnation." *New Jersey Div. of Youth and Family Serv. v. A.W.*, 103 *N.J.* at 604, 512 *A.*2d 438. In setting forth a list of "regular and expected parental functions," the Legislature attempted to identify the core values of parenthood, *i.e.*, the essential ingredients of the parental role. We do not suggest that a person's inability to perform any one of these functions necessarily incapacitates that individual from acting as a good parent. For example, a person's inability to provide adequate financial support, standing alone, should not be the basis for severing parental ties. The hallmark of an effective parent has never been his or her bank account, because we know that children can be and often are loved and nurtured in poverty-stricken families. Conversely, the ability to provide financial support, standing alone, cannot bar the State from intervening to prevent serious harm to the child, because we know that children can be and sometimes are neglected in affluent homes. Against

this backdrop, we believe the legislative intent was to establish several key parental standards upon which the parental abilities of the person resisting termination are to be measured. The Legislature did not intend to bar termination of parental rights merely because the parent is able to perform one or more of the parental functions listed. Nor was it the legislative design to compel automatically the severance of parental ties because a person is unable to perform one or more of the parental obligations set forth in the statute. Instead, termination hinges upon whether continuation of the parental relationship would place the child in imminent danger of serious harm, and the standards listed in the statute are to be considered within that context. *See In re Adoption of a Child by R.K.,* 303 *N.J.Super.* 182, 196, 696 *A.*2d 116 (Ch.Div.1997).

The record amply supports the Family Part's conclusion that continuation of T.S.'s parental relationship would place M.R. in substantial jeopardy. T.S.'s chronic addiction to drugs is well documented. Although T.S. likens his addiction to a disease such as cancer, we perceive a volitional aspect in his unwillingness to obtain treatment. We offer no moral judgments. In drawing a line between the sick and the bad, there is no purpose to subject others to harm at the hands of the addicted, and there can be no doubt but that T.S.'s abuse of drugs poses a serious risk to the health, safety and welfare of M.R.

So too, the fact that T.S. has lived a life of crime tends to negate his commitment to parental responsibilities. T.S.'s life has been punctuated by lengthy periods of incarceration. These lengthy custodial terms and the underlying crimes that gave rise to incarceration are "relevant in determining whether parental rights should be terminated, because [they] bear on parental unfitness." *In re Adoption of Children by L.A.S.,* 134 *N.J.* 127, 143, 631 *A.*2d 928 (1993).

Finally, T.S.'s longstanding psychological problems and his unwillingness to genuinely seek psychological treatment make it highly unlikely that he can fulfill the parental responsibility to

provide nurture and emotional support, to offer guidance, advice and instruction and to maintain a parental relationship with M.R. As noted by Dr. Bruskin, T.S.'s volatile relationship with his parents would place him in conflict concerning issues of child care, and thus their ability to assist in raising M.R. would inevitably be subverted.

Accordingly, the judgment of termination is affirmed.