706 A.2d 1129

IN THE MATTER OF THE GUARDIANSHIP OF
DMH, CLHW, LFH, AND RQH, MINORS.

Superior Court of New Jersey
Appellate Division

Submitted February 10, 1998—Decided March 6, 1998.

180

Before Judges CONLEY, WALLACE and CARCHMAN.

*Sanchez, Sanchez and Santoliquido*, attorneys for appellant L.R. (*Carolyn Ungvary*, on the brief).

*Peter Verniero*, Attorney General, attorney for respondent New Jersey Division of Youth and Family Services (*Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Minda Maisel*, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

L.R., the biological father of two of four children involved in this guardianship matter, appeals the termination of his parental rights on the grounds of abandonment. We reverse.

All four children have the same biological mother, K.H., who died in October 1995. In addition to L.R., who is the father of C.H. (now seven years old) and R.H. (now four years old), the Division of Youth and Family Services' complaint for guardianship sought to terminate the parental rights of J.M., the father of D.H. (now eleven), and of L.W., father of L.H. (now six years old).[1]

---

[1] L.W.'s parental rights were terminated; J.M.'s were not. L.W. does not appeal the termination.

When D.H. was five and C.H. was one, DYFS became involved with the family when L.H. was born in September 1991. At that time the hospital reported to DYFS that both mother and child had tested positive for cocaine and opiates. K.H. was referred to a detoxification program and after DYFS confirmed that she was attending a drug program, L.H. was released to the care of his maternal grandmother, with whom K.H. lived, along with her two other children, D.H. and C.H., and one or two other family members in a two-room apartment. Upon a home visit, the apartment was found to be overcrowded and K.H. with her children were referred to the Elizabeth Housing Authority.

In June 1993, when R.H. was born, K.H. again tested positive for drugs, this time heroin, as did R.H. Apparently the family was still living with the maternal grandmother. DYFS determined the conditions were "deplorable" and overcrowded and would not permit R.H. to live there. After an unsuccessful effort to locate alternative placements with family members, not including L.R.,[2] on June 22, 1993 K.H. signed a voluntary foster home placement agreement for R.H. and he was placed in a foster home.

DYFS learned of L.R.'s relationship with the children on November 18, 1993, when he came with K.H. during a visit.[3] At that time, he told the caseworker he was the father of C.H. and R.H., but that he wanted to care for all four of the children. It was his testimony during the termination hearing that from 1990 to the foster care placement of the children in 1993 he had daily contact with the family, living in the same motel, and supplying their daily needs. This testimony was not countered by anything in the record. At the time he told the caseworker in November 1993 that he wanted to be considered for placement of the children, his living accommodations (a one-room apartment) were not then

---

[2] At the time of R.H.'s birth, K.H. indicated that his father was L.W. It was not then known to DYFS that L.R. was the father of both R.H. and C.H.

[3] The record does not indicate with which child but we assume it was R.H. since he was the only child then in foster care.

sufficient, and his job as a caretaker for the aging owner of the Smith Cadillac dealership, at which he was earning $180 a week, "wasn't secure." He had no family relatives to help care for the children.

C.H. and L.H. were placed in foster care on November 24, 1993. Initially they were placed in the same home as R.H. but were later moved to their present foster home. R.H. was also moved from the initial placement to his present foster home. D.H., the oldest and most troubled of the children, apparently has been in several foster homes and, just prior to the termination proceeding, was placed in a "teaching family home." [4]

What is at the crux of this appeal is the undisputed fact that at no time did DYFS ever consider L.R. as a viable prospective caretaker and at no time did it ever develop any plans for reunification of the children with him. The following evidence is illustrative.

The primary concern of the caseworker in November and December 1993 when L.R. told DYFS he wanted to care for the children was his housing. A contemporaneous case note at that time states " '[L.R.] said although he is the father for [C.H. and R.H.] only, he would like to care for all the children but he does not have a permanent address at this time. He would like the Division to assist him and [K.H.] in finding an apartment. I told [L.R.] that we cannot find them [an] apartment. . . .' "

It was, then, made clear to L.R. in November and December 1993, that his living accommodations were not adequate. So, on

---

[4] As described by the psychologist, a teaching family home is "a family situation where the structure is of a family and the expectations of a family can be maintained, and to maintain the child in that setting and not to place them in a residential facility. And so the desire would be to teach her effective ways of coping, how to handle frustration, how to deal with feelings or concerns that she perhaps would manifest in an aggressive—an overt, aggressive manner, how to express the things that she desires in an appropriate fashion, how to get her needs met, how to build trust. The teaching family is a more specialized situation where they have some other levels of training and therefore, can respond to the child's needs in a different manner."

December 3, 1993, he went to the DYFS office with an application for an apartment in Elizabeth and requested a letter from DYFS stating that the children were going to be returned to him, in order to help him secure the apartment. He was told "we don't provide such letters until the children are placed with him." "A Catch 22 situation for some people; isn't it?", was the apt observation made by the trial judge. Additionally, while one of the DYFS caseworkers asserted that before considering L.R. for reunification a drug evaluation would have been performed, given some medical history showing prior drug use, it was admitted that such an evaluation was not requested of L.R. because reunification with him was never contemplated. This despite the drug treatment, homemaker, day care and shelter assistance offered K.H.

The most DYFS did for L.R. was to refer him to Legal Services, and told him that because of instances of domestic violence on the part of K.H. towards him, he would have to obtain a restraining order before placement of the children with him could be considered. He did obtain a restraining order. He also went to Legal Services, but was told nothing could be done for him.

L.R. testified during the termination proceeding that he "asked was there any kind of program or assistance that I could get. Being that I could not financially provide for them is there some kind of program that I could get involved with in which—similar to what they had approached [K.H.] with and where that it would be possible where I could get an apartment and to be able to investigate child care procedures, ... day care procedures, schooling procedures and I did make attempts for that, yes." He was consistently told there was nothing DYFS could do to assist him.

From 1993 to July 1995, the children remained in their respective foster homes with reunification with K.H. still the goal of DYFS. Throughout the three years, L.R. maintained consistent contact with the children, attending almost every bimonthly visitation that was scheduled. As described by one of the caseworkers "[L.R.] took an active role in participating in the visits ... I saw

him at a regular basis ... he had a lot of contact with all of the family—with all of the children."

The years of L.R.'s involvement has established a strong relationship between not only C.H. and R.H., but L.H. as well.[5] This is reflected by the May 30, 1996 psychological bonding report of DYFS's psychologist, Dr. Wells. The report describes Dr. Wells' observations of the interaction between L.R. and these children in the following manner:

The children arrived prior to [L.R.], although he was on time for his scheduled appointment. Upon seeing him, [C.H.], [R.H.], and [L.H.], half-sibling to [L.R.'s] children, ran to him, hugging and kissing him. Referring to him as daddy, it was apparent that they were mutually happy to see each other. [L.R.] arrived to the visit with snacks including individual beverages for each of the three children and a large bag of potato chips which he stated to the children had been purchased the day prior and refrigerated to make sure they were cold for them.

From the onset, it was apparent that [L.R.] had come prepared to visit with not only his biological children, but [L.H.] as well, who at no point did differentiate or show an unfavorable response. The interactions were pleasant with all three of the children overly demonstrating their enthusiasm in visiting with him. [L.R.] brought bubbles to the evaluation which immediately occupied the children's attention and focus. He showed them how to blow bubbles, gave each child a turn, and excitedly praised the child for the effort in attempting to blow a bubble.

[C.H.] made and maintained good eye contact with [L.R.] who talked to each child individually, looking at them while he spoke. He unreluctantly sat on the floor with the children, laughing, eating snacks, and blowing bubbles. There was an ease in relating with the activity being fun. The children sat in close proximity with him, each within touching distance. [L.R.] made physical contact with each child, none of who[m] pulled back or seemed to be uncomfortable with him touching them.

Relating positively to all three children, [L.R.] asked [C.H.] about her performance in school and spoke of activities and situations from earlier visits. Stating to them that he was glad to see them, [L.R.] related that he informed other employees at his job, "I'm going across the street to see my babies. I don't have time. I flew across the street."

Although [C.H.], the oldest child and most mature, attempted to determine how her brothers should respond, it was clear that [L.R.] was the adult figure structuring the visit. He complimented the children on their hair, showed them pictures from his wallet of themselves including a picture of their oldest sibling, [D.H.], and asked

[5] Since D.H.'s biological father's rights were not terminated, and since there is no psychological bonding evaluation of her at all, we do not address the relationship, if any, that may exist between her and L.R.

them questions pertinent to their live (sic) about school, holidays, activities, and church. The interaction was natural, pleasant, and easygoing. The children were focused, calm, and interacted without confusion or conflict. They played nicely together, showing consideration and sharing of the activities and snacks.

There was no indication at any time that all three children were not raised in the same household, although [R.H.] resides in an independent foster home. Each child called [L.R.] daddy, a title he did not reject. He referred to them as his children, calling [L.H.] "Vonnie" a name he did not reject or show anger when [L.R.] called him. (It is noted that [L.H.] verbalized opposition to this name when his biological father had referred to him as Vonnie earlier during a bonding evaluation with him. While he had corrected his biological father, no correction [was made] when [L.R.] referenced this name.)

Twice during the evaluation juice was spilled, initially by [L.H.] and then by [R.H.]. [L.R.] responded immediately to cleaning up the spilled beverage and then poured some from his bottle to replace his juice. [L.R.] was kind and non-critical, never overly angry, but merely placed a bag over the wet area so the children would not get wet. He then resumed the conversation, asking, "what did you do for Easter?"

At one point during the evaluation [C.H.] attempted to speak negatively about [L.H.'s] biological father, questioning "[L.H.], why you Daddy didn't bring no goodies?" [L.H.] replied "my daddy?" Seeming to realize that discomfort was about to occur, [L.R.] interjected, "because he knew daddy [L.R] would bring some. Whose your daddy? [asked to [L.H.]]" Without waiting for a response, [L.R.] stated, "me. All of you mine."

During her trial testimony, Dr. Wells described the relationship she observed between L.R. and the three children as "marvelous."

The May 30, 1996 report concludes not only that the children were bonded to L.R., but that they saw him as a parental figure, and that he, for his part, treated them in a positive parental fashion. This is a fair reading of the following "clinical impressions[:]"

[L.R.] promoted a loving, nurturing, and considerate environment among the children and with himself. At no point was he observed to be inappropriate, unkind, or show partiality to any of the children. It was apparent that he had planned for the visit and was excited to see the children.

Similar to [L.R.'s] enthusiasm relative to visiting with the children, immediately upon seeing him, each child overly showed their delight. It was apparent that [C.H., R.H. and L.H.] were pleased to see him. *Moreover, the bond between [L.R.] and the children was indicative of a father relating to his children and vice versa. The children were respectful of the adult-child division and responded to [L.R.] in an appropriate manner.*

[Emphasis added.]

Nonetheless, Dr. Wells concluded in her report that:

> Although it is noted by the present examiner that a positive and mutual bond exists between [L.R.] and the children, *no support can be given for him to secure care and custody of the children as he lacks the wherewithal to care for their day-to-day needs.*

The basis for Dr. Wells' ultimate conclusion that, while the children were bonded to L.R., they should not be reunited with him because he "lacks the wherewithal to care" for them, seems to be her May 24, 1996 psychological evaluation of L.R. There are several troublesome aspects of that report. Part of the "relevant background information" contained in the report is a reference to prior hospitalizations of L.R. at the psychiatric unit of the Elizabeth General Medical Center, the most recent admission having been April 25 to 28, 1994 during which he was diagnosed with schizoaffective disorder, organic mood disorder, and opioid dependence. This history of psychiatric episodes seems to have played some role in the doctor's assessment of L.R. L.R. referred to those past periodic hospitalizations as "rest periods" and the record reflects that they seem to have related to his relationship with K.H., who was abusive to him. There is nothing in the record to suggest that whatever may have been L.R.'s psychiatric problems they affected his relationship with the children. Neither was there any evidence as of the date of the termination hearing in October 1996 that he had had any recurrence of the April 1994 episode. And the doctor's "behavioral observations" of L.R. reflected no underlying pathological or behavioral defects. As her report reads:

> [L.R.] arrived early for his scheduled appointment, and patiently waited for the evaluator who was a half hour late. He was dressed in a vest and dress pants along with a tie. He presented as polite, cooperative, and seemed to recognize the social contexts of the evaluation. [L.R.] spoke candidly of his personal and interpersonal relationship with [K.H]. There was an idealized manner in which he perceived his relationship with her, stating that they had plans to secure a living environment where all four of the children could reside. This objective seemed to have gained greater momentum for him in light of [K.H.'s] death, although [L.R.] was not clear as to how he could proceed.
>
> Appearing older than his stated age, [L.R.] was cooperative with the demands of the evaluation, responded to all questions posed of him during both the clinical

interview and test protocol portion of this evaluation. His responses to the questions posed were relevant and goal-directed. No evidence of a thought disorder or a major affective disorder were elicited. He made and maintained good eye contact; did not overtly present features of anxiety, and established rapport with relative ease. Concerns relative to clarity of speech, intonation, or enunciation were not identified. Substance abuse or features typically associated with substance abuse was not noted. Although not formally assessed for intellectual capabilities, [L.R.'s] cognitive functioning is speculated to be within the average.

Presenting in a candid and frank manner, [L.R.] freely shared information about his relationship with the examiner, seeming to be pleased with the opportunity to discuss [K.H.] and the children. Although he was aware that termination of his parental rights to [C.H.] and [R.H.] were being pursued, [L.R.] shared plans for all of the children. Establishing that these two children were his only blood relatives, [L.R.] discussed his intention to not only pursue care and custody of [C.H.] and [R.H.], but to acquire the same for [D.H.] and [L.H.]. At no point during the evaluation did [L.R.] waver in his desire to secure care and custody of the children, but consistently stated that he had provided care in the past and believed if given resources, he could provide care for [the] children.

Yet it was still Dr. Wells' ultimate conclusion that

While finances and a residence could be secured, it is apparent that [L.R.'s] emotional and psychological functioning would hinder him from being independently effective in managing the day-to-day responsibilities of caring for [C.H.] and [R.H.].... Moreover, given the instability in his own life demonstrated in his *psychological functioning, transient living situations, and need for "rest periods,"* it is clear that [L.R.] would be apt to fail in providing a stable home environment for the children.

However, the "rest periods," the last of which was in 1994, as far as the record discloses, have had no impact upon L.R.'s relationships with the children, despite his consistent contact with them. As for the "transient living situations," from our review of the record, it seems that over the three year period of DYFS's involvement prior to the determination being made to seek termination, L.R. had two or three different addresses. But he certainly cannot be considered to have been homeless or transient.

As to the assessment of L.R.'s "emotional and psychological functioning," as far as we can tell the basis for the doctor's evident negative evaluation of L.R.'s psyche must stem from the results of a psychological test she gave to him, for her "behavior evaluation," as well as her later clinical evaluation in connection with the psychological bonding report, are certainly positive.

The test that she performed was the "Millon Clinical Multiaxial Inventory—II (MCMI–II)." The May 24, 1996 report describes it as "an instrument designed to assess pathological characteristics and dynamics which interfere with optimal personal and interpersonal functioning." But the description of the test acknowledges that "[t]his inventory does not focus on positive attributes and strengths which the individual possesses[,]" and that one must "keep in mind the emphasis on pathology, purposefully constructed by the authors of the test so as to optimize clinical utility."

Based upon this test, this is what Dr. Wells predicted:

Evidence of a moderate level of pathology exists in [L.R.'s] overall personality structure. He likely has a checkered history of disappointments in his personal and family relationships. Deficits in his social attainments may be notable, as well as [a] tendency to precipitate self-defeating vicious circles. Earlier hopes may have resulted in frustrating setbacks, and efforts to achieve a consistent niche in life may have failed. Although [L.R.] may usually be able to function on a satisfactory ambulatory basis, he may experience periods of marked emotional, cognitive, or behavioral dysfunction.

On the surface, [L.R.'s] behavior is characterized by submissiveness, dependency, and the seeking of affection, attention, and security. A fear of abandonment often compels him to be overly compliant and obliging. He may be quite naive about interpersonal matters, and may evince scattered and immature thinking. When faced with interpersonal tensions, he seeks instant signs of reassurance or tries to maintain an air of Pollyanna buoyancy, thereby denying disturbing emotions and inner discomforts. Uncomfortable when alone and preoccupied with the fear of being abandoned, [L.R.] is likely to be exceedingly responsive to the desires of others.

Having learned to play an inferior role, [L.R.] allows others to feel more useful, stronger, and more competent than he. An active soliciting of praise and a tendency to be self-sacrificing and conciliatory are apparent. He persistently seeks harmony with others, even at the expense of his internal values and beliefs. Although he tries to avoid situations that involve personal conflict, his efforts at control give way at times, and his resentments and frustrations over his acquiescence and self-denial break into the open.

[L.R.'s] repressed anger and irritability also derive from an awareness that he has no identity apart from others. He has learned to value the intrinsic traits of those who are important to him, not his own. Despite his need to ally himself with the competencies of others, [L.R.] is no longer bolstered by the illusion that these relationships fulfill his needs or protect him against loss. Despite his growing disillusionment with others, he remains alert to signs of potential hostility and rejection, and seeks to minimize the danger associate[d] with the disapproval or indifference of others. He has learned that by closely attending to the signals and desires of others, he can shape his behavior to conform to their wishes and needs.

> In spite of a growing desire for a measure of independence, [L.R.] feels helpless when faced with responsibilities that demand autonomy or initiative. The loss of a significant source of support or identification may prompt acute distress and may compel him to openly solicit signs of reassurance. Guilt, illness, anxiety, and depression may be displayed instrumentally to deflect serious criticism and to transform threats of disapproval into those of support and sympathy.

Aside from L.R.'s past drug use, brief hospitalizations, low paying employment and less than optimum living accommodations, the record does not particularly empirically support Dr. Wells' predictions.[6] If she drew them from the test results, we wonder how a balanced psychological assessment of such a fundamental issue as a person's parental fitness could be the product of a test that seems to be skewed towards the negative elements of one's psyche and which intentionally omits consideration of the positive attributes and strengths a person may have.

In contrast is the psychological bonding evaluation of C.H. and L.H. with their foster parents. It was performed on the same day of L.R.'s evaluation, May 24, 1996. The foster parents, then 57, had taken on foster children "to fill a void as a result of not having grandchildren." Discussing their relationship with L.R., they told Dr. Wells that they never had had any "problem out of" him, that he did not "teach [C.H] against [them]. They say nice things. [L.R.] sent a Christmas card. He wrote it himself." Yet, when asked whether they would agree to allow him to visit the children after adoption, the response was "we have to think about that."

During the foster parent bonding evaluation, Dr. Wells observed the following as to the interrelationship between the foster parents and the children:

> Referring to [the foster parents] as daddy and mommy, respectively, [C.H.] and [L.H.] played nicely together as the [foster parents] shared information with the

---

[6] In addition, "[a]lthough there are no concerns expressed by the Division indicative of physical maltreatment on the part of [L.R.]," Dr. Wells administered a "Child Abuse Potential Inventory (CAPI)" and concluded "[d]emonstrating a valid profile, [L.R.] received an elevated overall abuse score consistent with a score obtained by the upper five percent of those persons who were known child abusers." Clearly, there is nothing to suggest L.R. is or would be a child abuser and, quite properly, the trial judge did not utilize this aspect of the report.

examiner. On occasion, [C.H.] would come into closer proximity in an effort to hear what was being said, although for the most part she seemed to be cognizant of the need for an invisible boundary which suggested that she was to continue to be occupied with her own activity. Both [foster parents] were observed to maintain a close eye on both of the children, at times interjecting comments to them either about what they were doing or reminding them of what was appropriate behavior. Their manner was pleasant with the children, showing no favoritism or preferential treatment of either [C.H.] or [L.H.].

[L.H.] took his cues for behaving from [C.H.] who demonstrated a stronger personality and was clear[ly] in leadership role. She responded like an older sister, a role that [L.H.] seemed to [ ] respect and appreciate. The children talked and laughed with each other, playing with objects in the room and pretending to be characters. The relationship between the two of them was close with no observable conflict or discord. The fourteen month difference between the two of them seemed more exaggerated as [L.H.] presented in a somewhat more immature manner than his sister. He was also noted to have more difficulty in his speech patterns, although he would express himself. His speech was not clear. To a person unfamiliar with him, close attention would have to made to understand what he was saying. It did not appear that neither the [foster parents] nor [C.H.] had any difficulty understanding [L.H.'s] expressive speech.

[The foster parents] related to each other in pleasant, kind manner, seeming to enjoy the shared responsibility of both of the children. They jokingly teased each other about the manner in which the other provided treatment and care of the children, with [the foster father] remarking on how his wife frequently shops for the children, although "they'll never be able to wear all of those things." [The foster mother] laughed at her husband's comment, reminding him of how he allows the children extra treats. It was apparent that both [foster parents] enjoyed their relationship and role with the children.

The interactions between the [foster parents] and the children were natural and calm. At no point during this observation were the children spoken to in a harsh manner. Moreover, while it was not verbalized by either [foster parent], it seemed that both [L.H.] and [C.H.] understood what behaviors were expected of them. They were compliant, well-mannered, and did not demand or display great needs for attention. [The foster parents] interchangeably responded to the children's need for praise or commented about what they were doing in a non-competitive manner. [The foster father's] role with the children was easily recognized as significant, not peripheral, a role [the foster mother] appeared to value and appreciate.

When speaking with the children, an appropriate voice tone as well as appropriate contextual material was discussed. Good eye contact was made with smiles, seemingly for no reason, when looking at the children. While the [foster parents] shared that they became interested in foster care to fill a void as a result of not having grandchildren, the manner in which they related and responded to [C.H.] and [L.H.] was indicative of their primary parents.

These observations led Dr. Wells to conclude:

An apparent bond between the [foster parents] and [L.H.] and [C.H.] is easily observable. The children relate to the [foster parents] as their psychological

parents, looking to them to provide care, nurturance, and approval. Both [foster parents] readily comply with these expectations, seeming to enjoy the opportunity they have been given. There is a kind, pleasant manner in which [the foster parents] relate which appears to set a tone for the type of interactions the children have with each other. There is a sense of family, and connectedness, and sharing. It is strongly recommended that [C.H.] and [L.H.] would remain in placement together. While there have (sic) been a past history of instability for them, especially [C.H.], the stability they provide for each other is quite apparent. It is the clinical impression of the present evaluator that [the foster parents] are caring, loving individuals who desire adoption of not only [C.H.] and [L.H.], but their younger sibling, [R.H.], as well. If the children become eligible for adoption, support is given to the [foster parents] becoming all three children's adoptive parents, especially in light of [R.H.'s] foster mother's intentions not to adopt him. Having observed [C.H.], [L.H.], and [R.H.], placement of him in the [foster parent's] home would allow him to have the least complications as a result of being separated from his current foster mother as he relates to the older children in a comfortable, familiar manner. It is believed that [the foster parents] would be sensitive to [R.H.'s] needs and assist greatly in ensuring a successful transition to their home.

We pause to comment on the recommendation of Dr. Wells relating to R.H. Just how suspect Dr. Wells' entire evaluation of the situation may be, is reflected by her conclusion that R.H. should be adopted by the foster parents of C.H. and L.H.. R.H. has never been in their home. The only bonding evaluation for R.H. is the positive one with L.R. Moreover, there is nothing in the record that would indicate that removal of R.H. from his present foster home to placement with C.H. and L.H.'s foster parents would successfully lead to adoption. We note, in this respect, that the foster parents have had other foster children in addition to C.H. and L.H., and that these placements were not successful, including D.H. The psychological bonding report of the foster parents indicates that D.H. believed she was going to be returned to her maternal grandmother and that, as a result, "significant difficulties" arose such that the foster parents requested that she be removed from their care. We do not say this to denigrate the foster parents, but only to show that not all placements are successful and to point out the speculativeness of Dr. Wells' conclusions as to R.H.

Equally troublesome, no psychological evaluation of the children themselves and no assessment of the impact that severance of

their ties with L.R. might have upon them was performed. Moreover, while the hope obviously is that R.H. will be reunited with C.H. and L.H., there is no assurance of that. And no evaluation was performed to assess the potential harm in the event of severance of his sibling ties to C.H. and L.H., should adoption in the same family not be possible.

*I*

L.R. presented circumstances that could be those of many parents. He clearly provided nurture and affection to the children, and, according to his undisputed testimony, provided for their daily needs prior to DYFS' 1993 involvement. He was, nonetheless, viewed by DYFS and Dr. Wells as inadequate in his parenting skills. As the Supreme Court pointed out in *New Jersey Div. of Youth & Family Servs. v. A.W.*, 103 *N.J.* 591, 606, 512 *A.*2d 438 (1986), "we are not concerned here with what may be called 'inadequate parenting'[7] ... a court should focus upon

---

[7] The Supreme Court in *A.W.* considered it important to include the definition of "inadequate parenting" from Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards*, 27 *Stan.L.Rev.* 985, 1021–24 (1975). So do we:

> While no empirical studies provide a statistical breakdown of the reasons for intervention in neglect cases, probably the largest category of cases involves persons thought to be "inadequate parents." All commentators agree that the great majority of neglect cases involve very poor families who are usually receiving welfare. Most of the parents are not merely poor, however. In addition to the problems directly caused by the poverty—poor housing, inadequate medical care, poor nutritional practices—many of these parents can be described as extremely "marginal" people, that is they are continually at the borderline of being able to sustain themselves—economically, emotionally, and mentally. Their plight is reflected in their home situations. Their homes are often dirty and rundown. Feeding arrangements are haphazard. One or both parents may * * * be retarded, which may affect the quality of their child care. * * * *
>
> Such parents may provide little emotional support for their children. While the children may not be physically abused, left unattended, dangerously

whether ... the parents are giving the child the nurture and

malnourished, or overtly rejected, they may receive little love, attention, stimulation, or emotional involvement.

\*    \*    \*

It is certainly very tempting to intervene to help such children. Intervention might be justified both to protect the children by providing them with an environment in which they can better reach their potential and to protect the state, since it is claimed that such children will probably end up as delinquents, criminals, or welfare recipients. Without intervention, we may be perpetuating a "culture of poverty."

Despite the appeal of these arguments, parental "inadequacy" in and of itself should not be a basis for intervention, other than the offer of services available on a *truly* voluntary basis. The term "inadequate home" or "inadequate parent" is even harder to define than emotional neglect. There is certainly no consensus about what types of "inadequate" behavior would justify intervention. Given the vagueness of the standard, almost unlimited intervention would be possible.

\* \* \* \* In fact, by focusing solely on parental behavior, child-care workers often ignore the many strengths a given child may be deriving from his environment. As I have stressed, the complexity of the process by which a child relates to any environment defies any attempt to draft laws solely in terms of environmental influences.

Moreover, there is every reason to be extremely pessimistic about the utility of coercive intervention. The services necessary to help these families are generally unavailable. More day-care centers, homemakers, health facilities, and job training programs would all be needed if intervention were to mean anything more than periodic visits by a social worker. Such visits themselves are costly, have not been shown to be effective, and may be resented by the parent who will blame the child for the outside meddling. Even when "inadequate" parents seek help, agencies often lack the resources or ability to alleviate undesirable home conditions. The chances of success are even lower when the family resists intervention. Few communities have sufficient personnel and programs to permit meaningful intervention, even in cases involving physical abuse or severe emotional damage. It is highly questionable whether limited resources ought to be expended on families with less severe problems, unless the families request services or accept them voluntarily.

Furthermore, when parents do not respond to the "treater," the next step is to remove the children. Yet there is no evidence demonstrating that children from such families are helped through placement.

In an ideal world, children would not be brought up in "inadequate" homes. However, our less than ideal society lacks the ability to provide better alternatives for these children. The best we can do is to expand the social welfare services now offered families on a voluntary basis.

[*A.W.*, *supra*, 103 *N.J.* at 606–07 n. 8, 512 *A.*2d 438.]

affection that money cannot provide." [8]

Moreover, termination of biological ties, severing as it does not only the parental rights, but the ties of the child to the parent and, frequently, to siblings and other extended biological family members, requires careful scrutiny, an exacting analysis, and proof that is clear and convincing. *E.g., In the Matter of the Guardianship of J.C.*, 129 *N.J.* 1, 10, 608 *A.*2d 1312 (1992); *In the Matter of the Guardianship of K.H.O.*, 308 *N.J.Super.* 432, 706 *A.*2d 226 (App.Div.1998). And, even where reunification with a parent may not be feasible, yet the biological parental and sibling ties are prominent, severance of those relationships in order to "free" the child for adoption, frequently viewed as a "permanent" and thus desirable solution, may not always be the best answer from the perspective of the child. As we pointed out in *K.H.O.* in the context of the best interests grounds for termination of parental rights:

> The primary goal of the Child Placement Act, of course, is to obtain a permanent solution for any child placed in foster care, whether it be through reunification with the natural parent or the extended biological family, or through termination of the biological ties and adoption. *N.J.S.A.* 30:4C–53.4 to –60. *See New Jersey Div. of Youth & Family Servs. v. K.M.*, 136 *N.J.* 546, 558, 643 *A.*2d 987 (1994) ("In recognition of [the Child Placement Act's] preference for permanency for children, DYFS is required to prepare a placement plan with a goal for permanency of any child placed in foster care for the second time. *N.J.S.A.* 30:4C–53.3. Also, the 'best interests' test under *N.J.S.A.* 30:4C–15.1 requires finding that a delay of permanent placement further harms a child."); *A.W., supra*, 103 *N.J.* at 610, 512 *A.*2d 438

---

[8] As defined in the context of private adoptions the "regular and expected parental functions of care and support" that a parent must fulfill in order to preserve his or her right to object an adoption are defined as (a) "the maintenance of a relationship with the child such that the child perceives the person as his parent," (b) "communicating with the child or person having legal custody of the child and visiting the child" unless visitation cannot be accomplished because of incarceration or prevented by the custodial person or agency, and (c) "providing financial support for the child" unless prevented by the custodial person or agency. *N.J.S.A.* 9:3–46a(2)(a), (b), (c). L.R. seems to satisfy these criteria. Moreover, as we have recently observed, the overriding consideration must always be whether continuation of the parental relationship would place the child in imminent harm. *In the Matter of Adoption of a Child by W.P. and M.P.*, 308 *N.J.Super.* 376, 385–86, 706 *A.*2d 198 (App.Div.1998).

(stating that permanence is important to nurturing a child); *In the Matter of the Guardianship of S.C.*, 246 *N.J.Super.* 414, 425, 587 *A.2d* 1299 (App.Div.), *certif. denied,* 126 *N.J.* 334, 598 *A.2d* 891 (1991) (finding that delay of permanent placement would "only work to [child's] detriment").

And a "stable and permanent home" is always preferable to long-term foster care. *New Jersey Div. of Youth and Family Servs. v. B.G.S.*, 291 *N.J.Super.* 582, 592, 677 *A.2d* 1170 (App.Div.1996); *A.A.M., supra,* 268 *N.J.Super.* 533, 634 *A.2d* 116. But without the necessary statutory proof of each of the four-prong "best interests" tests, stability and permanency alone are not sufficient to justify termination of the child's biological ties. Moreover, the option for long-term foster care allowing for continued contacts with the child's biological family is not only not prohibited by the Legislature, but is expressly authorized. *N.J.S.A.* 30:4C–26.10 to –28; *N.J.S.A.* 30:4C–26.11(b) ("[i]f it has been determined that reuniting the child with the natural parents or placing the child for adoption will not serve a child's best interest, the child's best interest may be served through a transfer to long-term foster custody with the child's foster parent....").

[*K.H.O., supra,* 308 *N.J.Super.* at 443–44, 706 *A.2d* 226.]

And we further observed in *K.H.O.:*

> The concern, moreover, is not just severance of biological ties from the perspective of the parent, but just as importantly, perhaps more so, from that of the child. *See New Jersey Div. of Youth & Family Servs. v. T.C. & I.R.,* 251 *N.J.Super.* 419, 439–40, 598 *A.2d* 899 (App.Div.1991), *certif. denied,* 146 *N.J.* 564, 683 *A.2d* 1160 (1992) ... "Experts are increasingly concerned about the seriousness of this loss and are recognizing the need for continued contact with a biological parent, even a flawed parent ... Our courts have recognized that a child's relationship with a parent is of such significance that doubts are to be resolved against its destruction.' " (quoting *In the Matter of the Guardianship of J.E.D.,* 217 *N.J.Super.* 1, 15–16, 524 *A.2d* 1255 (App.Div.1987)). *And see In the Matter of the Guardianship of K.L.F.,* 129 *N.J.* 32, 608 *A.2d* 1327 (1992); *J.C., supra,* 129 *N.J.* at 10, 608 *A.2d* 1312; *In the Matter of A.,* 277 *N.J.Super.* 454, 469–72, 649 *A.2d* 1310 (App.Div. 1994). *Cf. N.J.S.A.* 30:4C–15.1(a)(3), (c) (requiring "diligent efforts" by DYFS to encourage and strengthen the parental relationship); *N.J.S.A.* 9:6B–4(e), (f) (children in foster care entitled to continued contact with biological parents and siblings under the Child Placement Bill of Rights Act).

[*Id.* at 441–42, 706 *A.2d* 226.]

## II

In terminating the family's biological ties, the trial judge found that L.R. had abandoned his parental duties. In this respect, *N.J.S.A.* 30:4C–15(d) permits DYFS to file a guardianship petition where:

> it appears that a parent or guardian of a child,.... or following the placement or commitment of such child in the care of an authorized agency, whether in an

institution or in a foster home, and *notwithstanding the diligent efforts of such agency to encourage and strengthen the parental relationship, has failed substantially and continuously or repeatedly for a period of more than 1 year to maintain contact with and plan for the future of the child, although physically and financially able to do so; . . . .*

[Emphasis added.]

It is clear that *N.J.S.A.* 30:4C–15(d) does not apply. To begin with, L.R. never ceased maintaining contact with the children. And, he did attempt the first step in a plan, that is to obtain satisfactory housing. DYFS, however, offered no assistance in that respect. The very premise of his inability to provide a plan, then, was DYFS' view that he could not either physically, as opined by Dr. Wells, or financially, as evidenced by his inability on his own to obtain satisfactory housing. But a basic requirement of termination under *N.J.S.A.* 30:4C–15(d) is that the parent be both physically and financially able to plan for the future of the child.

More fundamentally, the record is totally absent of any evidential basis for the trial judge's conclusion that DYFS engaged in "diligent efforts ... to encourage and strengthen the parental relationship." All that was done was permit L.R. to visit the children on a bimonthly basis.

"Diligent efforts" are "reasonable attempts by an agency authorized by the division to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure." They include, but are not limited to:

(1) consultation and cooperation with the parent in developing a plan for appropriate services;

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development and health; and

(4) facilitating appropriate visitation.

[*N.J.S.A.* 30:4C–15.1(c).]

By its own admission, other than for visitation, DYFS took none of the above steps to encourage and assist L.R. in his obviously sincere efforts to be reunited with the children and to provide a

home for them. That is because it never considered him for reunification because he was perceived as the noncustodial parent. But we know of no such limitation upon DYFS's required "diligent efforts." Dr. Wells thought L.R. would not be able to provide an adequate home. But, since no efforts were ever taken toward that direction, we cannot say that that is clearly and convincingly so. Had shelter assistance, homemaker and day care services of the type offered to many custodial parents been provided to L.R., a fair review of the record leaves us with some sense that reunification with L.R. may well have succeeded.

■ But the trial judge determined that L.R. had "abandoned" the biological ties. In this respect, *N.J.S.A.* 30:4C–15(e) provides for the filing of a petition for guardianship where "the parent has abandoned the child." Abandonment as a statutory basis for termination is set forth in *N.J.S.A.* 30:4C–15.1(b):

> The division shall initiate a petition to terminate parental rights on the ground that the "parent had abandoned the child" pursuant to subsection (e) of section 15 of P.L.1951, c. 138 (C.30:4C–15) if the following standards are met:
>
> (1) a court finds *that for a period of six or more months:*
>
> (a) the parent *although able to* have contact, *has had no contact* with the child, the child's foster parent or the division; and
>
> (b) the *parent's whereabouts are unknown,* notwithstanding the division's diligent efforts to locate the parent; or
>
> (2) *where the identities of the parents are unknown* and the division has exhausted all reasonable methods of attempting identification, the division may immediately file for termination of parental rights upon the completion of the law enforcement investigation.
>
> [Emphasis added.]

Plainly, as with *N.J.S.A.* 30:4C–15(d), *N.J.S.A.* 30:4C–15.1(b) does not apply. L.R. has always maintained contact and his whereabouts are well known.

■ Further, the Supreme Court has stated that "in every context ... a very strong showing of abandonment or neglect ... is required" to terminate biological ties on that basis. *In the Matter of the Adoption of Children by L.A.S.,* 134 *N.J.* 127, 134, 631 *A.*2d 928 (1993) (citations omitted); *J.C., supra,* 129 *N.J.* at 17, 608 *A.*2d 1312. The biological parent " 'must have engaged in a

course of conduct that evidences a settled purpose to forego all parental duties and relinquish all parental claims to the child.' " *In the Matter of the Adoption of a Child by D.M.H.*, 135 *N.J.* 473, 481, 641 *A.*2d 235, *cert. denied sub. nom., Hollingshead v. Hoxworth,* 513 *U.S.* 967, 115 *S.Ct.* 433, 130 *L.Ed.*2d 345 (1994) (quoting *L.A.S., supra,* 134 *N.J.* at 135, 631 *A.*2d 928).

In *L.A.S.,* a father's lengthy incarceration in prison was a material factor bearing on whether his parental rights should be terminated due to abandonment or parental unfitness. The Court explained that under *N.J.S.A.* 30:4C–15(d), there must be "a showing that the parent has failed for at least one year, despite the agency's diligent efforts, to rectify the circumstances leading to removal." *Id.* at 133, 631 *A.*2d 928. Elaborating on what constitutes abandonment, the Court stated:

> [a]bandonment requires a finding that a parent has willfully forsaken obligations, although physically and financially able to discharge those obligations. The parent must have engaged in a course of conduct that "evidence a settled purpose to forego all parental duties and relinquish all parental claims to the child."
>
> [*L.A.S., supra,* 134 *N.J.* at 134–35, 631 *A.*2d 928 (quoting *In re N.,* 96 *N.J.Super.* 415, 426, 233 *A.*2d 188 (App.Div.1967) (citations omitted)).]

In *J.C., supra,* the biological mother's inability to provide a stable and permanent home in large part because of her drug addiction, resulted in foster home placement for her three children for six years and consequent bonding with the foster parents. In addition to rejecting the "best interests" criteria for termination, abandonment was also rejected. In doing so, the Court noted her continued interest in the children during the years of the foster home placements as evidenced by her consistent visits. 129 *N.J.* at 11, 608 *A.*2d 1312. Yet, DYFS chose not to return the children to her care because it harbored concerns regarding her unstable housing situation, her continued use of drugs and alcohol and reports of domestic violence in the home. *Ibid.* Despite these circumstances, the Court concluded there was "no basis for termination" under *N.J.S.A.* 30:4C–15(d). *Id.* at 16, 608 *A.*2d 1312. "The concept of abandonment entails volitional and purposeful conduct that equates with a willful giving up of parental rights and

duties." *Id.* at 17, 608 *A.*2d 1312 (citing *In re Guardianship of K.L.F.*, 129 *N.J.* 32, 38–40, 608 *A.*2d 1327 (1992)).

In *K.L.F.*, *supra*, 129 *N.J.* 32, 608 *A.*2d 1327, a homeless parent, upon the birth of her child, agreed to a temporary custody arrangement with DYFS. She visited the child twice and then went to New York City to look for permanent housing. During the following year and a half, the parent had neither work nor a home and lived in shelters and with friends. She claimed to have tried to contact DYFS by phone but was never able to reach anyone who knew about her child's case. Her efforts were characterized by the trial court as " 'ineffectual, paltry, and meager.' " *Id.* at 38, 608 *A.*2d 1327. DYFS determined that the child needed a permanent home and moved her to pre-adoptive foster parents, where she continued to reside throughout the course of the litigation. Evidence was presented by DYFS that the child had bonded with her pre-adoptive parents and that to return her to her mother, whom it claimed had abandoned her, would cause her psychological and emotional harm. Nonetheless, in addition to commenting upon DYFS' lack of any real effort to locate the mother to attempt reunification, resulting in foster care placement for the first four years of the child's life, not to mention bonding with the foster parents, the Court rejected the conclusion of DYFS that the mother had, by virtue of her "abandonment" of the child, caused unremedial harm. There was no "willful surrender or intentional abdication of parental rights and duties" sufficient to constitute abandonment under Title 30. *Id.* at 39, 608 *A.*2d 1327.

Factors weighing against the termination of parental rights based on abandonment include the parent's genuine interest in the well being of the child and a sincere desire to regain custody. In *The Matter of the Guardianship of J.E.D.*, 217 *N.J.Super.* 1, 12, 524 *A.*2d 1255 (App.Div.1987), DYFS attempted to prove that the mother lacked a sincere motivation to preserve her parental relationship under *N.J.S.A.* 30:4C–15(d) After hitting the child on one occasion, the mother voluntarily contacted DYFS because she was concerned about her ability to care for the child. She initially

had monthly, and then weekly visitations with her child, although her visits became less frequent when she began traveling to a different state in an effort to mend her marriage and provide a better home environment for the child. *Id.* at 12, 524 *A.*2d 1255. Nevertheless, we agreed with the trial judge that the record failed to support a finding that the mother had forsaken her parental rights. Rather, the mother showed "a real interest for the well being of her daughter and a sincere desire to regain custody of her...." *Ibid.* She also showed a desire to cooperate with DYFS and had participated in counseling and other programs at its request. *Ibid. See also In the Matter of the Adoption of a Child by J.R.D.,* 246 *N.J.Super.* 619, 629, 588 *A.*2d 446 (Ch.Div.1990) (no abandonment found where natural father, who suffered from chronic alcoholism, failed to visit daughter for six years as his failure to visit was "more attributable to his pathetic physical addiction than to a mindset fixed upon evasion of responsibility."). *And see New Jersey Div. of Youth & Family Servs. v. T.C. & I.R.,* 251 *N.J.Super.* 419, 439–40, 598 *A.*2d 899 (App.Div.1991), *certif. denied,* 146 *N.J.* 564, 683 *A.*2d 1160 (1992). *Contrast In the Matter of the Guardianship of J.T.,* 269 *N.J.Super.* 172, 634 *A.*2d 1361 (App.Div.1993); *In the Matter of the Guardianship of A.A.M.,* 268 *N.J.Super.* 533, 634 *A.*2d 116 (App.Div.1993); *In the Matter of Adoption of a Child by F.O. and W.O.,* 307 *N.J.Super.* 176, 704 *A.*2d 604, (Ch.Div.1997); *In the Matter of the Adoption of a Child by R.K.,* 303 *N.J.Super.* 182, 198–99, 696 *A.*2d 116 (Ch.Div.1997).

In reaching the conclusion that termination under Title 30 has not been established here, we would be remiss were we not to address *F.O. and W.O., supra,* 307 *N.J.Super.* 176, 704 *A.*2d 604, and *R.K., supra,* 303 *N.J.Super.* 182, 696 *A.*2d 116. Both cases were decided in the context of a private adoption under *N.J.S.A.* 9:3–46. Such an adoption cannot proceed in the face of a parent's objection. Subsection a, however, contains an abandonment provision which permits a court to approve an adoption if the parent has "(1) ... substantially failed to perform the regular and expected parental functions of care and support of the child

although able to do so, or (2) . . . is unable to perform the regular and expected parental functions of care and support of the child and [such inability] . . . is unlikely to change in the immediate future." The trial judge construed these provisions, added by amendment in 1994, to remove any element of willfulness or intentional forsaking of parental duties, concluding that "[t]he overall effect of the amendments is that it is now much easier for the court to terminate an individual's parental rights than in the past because the court need only weigh the statutory criteria and need not inquire into whether the parent possessed the actual intent to abandon or neglect." *F.O. and W.O., supra,* 307 *N.J.Super.* at 176, 704 *A.*2d 604; *R.K., supra,* 303 *N.J.Super.* at 194, 696 *A.*2d 116.

We disagree and disapprove of this aspect of *F.O. and W.O.,* and *R.K.* As the Supreme Court observed in *D.M.H., supra,* decided after the 1994 amendments, Title 9 proceedings and Title 30 proceedings must be read in *para materia* and it construed abandonment in both contexts as requiring some aspect of willfulness and intentional forsaking of parental duties. 135 *N.J.* at 481, 641 *A.*2d 235. *And see N.J.S.A.* 9:6–8.21, also amended in 1994, but still requiring that a child be "willfully abandoned" in an abuse or neglect proceeding based upon abandonment under subsection of *N.J.S.A.* 9:6–8.21(c)(5).

### III

■ We touch only briefly on DYFS' contention that the best interests test was met under *N.J.S.A.* 30:4C–15.1(a). First, the trial judge did not find this criteria had been demonstrated and DYFS did not file a cross-appeal. Second, the trial judge's well supported conclusion that L.R. had not harmed the children, the first of the four prong best interests test under *N.J.S.A.* 30:4C–15.1(a) and *A.W., supra,* 103 *N.J.* at 604–05, 512 *A.*2d 438, is unassailable. Third, our conclusion that DYFS did not engage in diligent efforts to reunite the children with L.R. prior to proceeding with the termination, renders the record deficient as to the

third prong of the best interests tests. Fourth, the last, and perhaps most critical prong, that termination will not do more harm than good, was equally not established. We recognize that Dr. Wells concluded that C.H. and L.H. would be harmed if removed from their foster parents. But there is little, if any, analysis of the harm of permanently severing their ties with L.R., as well as possibly severing their ties with R.H. And there is no consideration of any harm as to R.H. All three children are depicted in the record as having strong bonds with L.R. We cannot imagine that severance of those bonds will not have an adverse impact upon them that may endure for years. If that harm is to be risked, there must be much more than presented in this case.

## IV

We address briefly what appears to be at the heart of the trial judge's determination to terminate L.R.'s biological ties to the children, that is his definition of what a parent should be, relying upon out-of-state cases. In this respect, the judge said:

> From all of these cases then we can at least synthesize a general description of what can be expected or constitute a true parent/child relationship or role. The parent will attempt to or provide significant contact to the degree that the child grows or is nurtured by the relationship with that parent. Such activity should include guidance, instruction or advice in the child's development. It should also involve the development and maintenance of an emotional relationship with the child. Such association of parent to child has to be described as a nurturing one where the child's needs are put ahead of that of the parent. How frequent the communication between parent and child aside from the extent and the quality and nature of the communication is a factor. Emotional support aside from financial support is most critical. This requires an awareness of the happenings if not the daily occurrences in that child's life. A willingness to take on responsibility for the emotional well-being of this child also is included within such a definition. Casual visits and occasional gifts are not sufficient to evidence parental responsibility. Love alone without actual care and presence will not create a partial definition.

> Such a concept requires affirmative parenting to the extent it is both practical and feasible under all of the circumstances. An ongoing parent/child relationship develops ordinarily as a result of a parent's having met on a continuous basis if not daily the physical, emotional, moral and educational needs of the child. Because a child needs more than a benefactor, parental duty requires that the parent exert him or herself to take and maintain a place of importance in that child's life. When

in foster care, the parent has an affirmative duty to work toward return of the child. From these many specific definitions presented by the Court a composite has to be drawn. If as here the Division has found earlier pursuant to 30:4C–15D that the agency has made diligent efforts to strengthen and encourage the parental relationship as defined then at least it would appear [L.R.] and [L.W.] both seem[ ] to have failed now for the period of time in question to plan for the future of their individual children, although they appear able to do so and it appears that the statutory requisites required of the Division are satisfied.

The judge then concluded that "there has been no significant role attempted by [L.R.] ... in an effort to obtain or gain a plateau for child-rearing to invoke any plan that the Division would be obligated to." That the judge's concept of what a parent should be was the premise of L.R.'s termination is clear from the following:

> The Court cannot be critical of [L.R.] ... that [he] did not have anything more than a room, if that, for [his] habitation. That is unfortunate. For reasons best known and understood to [him][he] simply *[has] been unable to move forward or further in a concrete way to create, as indicated, the parenting relationship that has been suggested and defined.*
>
> The Court is not suggesting that [L.R.] [is] satisfied simply to visit regularly such as some favorite relative who drops in and the children are happy to see. But *[he] just [has] not been able to be [a] parent father[ ] within the definition of that role. [He][has] not been able to sustain the momentum as it were to step up to another level to invite or activate the potential for a true father/child growth and development and ultimate living arrangement.*
>
> [Emphasis added.]

■ The judge's concept of a "true father/child growth and development and ultimate living arrangement" is laudable and socially desirable. Would that all parents could measure up to the judge's defined parental role. But judicial interference with a family cannot be premised upon notions of what a parent should ideally be. *A.W., supra,* 103 *N.J.* at 606, 512 *A.*2d 438. *Cf. In the Matter of the Guardianship of A.A.M., supra,* 268 *N.J.Super.* at 547–48, 634 *A.*2d 116 ("[t]o ask a court to terminate parental rights is to impose upon it an agonizing burden in any case. To ask a court to terminate parental rights because the individual lacks 'the fundamental personal qualities necessary for minimally adequate parenting' is to present the trial judge with a decision that would tax Solomon. And to empower a court to terminate parental rights on such grounds raises the possibility of grave misuse in the future."). *And see N.J.S.A.* 9:3–46a(2)(a), (b), (c) (defining paren-

tal functioning as requiring the maintenance of a parent/child relationship, communication and visitation, unless prevented by the custodial person or agency, and financial support, unless prevented by the custodial person or agency.); *In re Adoption of a Child by W.P. and M.P., supra,* 308 *N.J.Super.* at 385–86, 706 *A.*2d 198.

## V

We, thus, reverse the termination of C.H. and R.H.'s biological ties with L.R. L.H.'s biological father has not appealed the termination of his rights. But a substantial consideration of that termination was Dr. Wells' concern over separating C.H. and L.H. Their sibling ties are, perhaps, stronger than any other. The May 24, 1996 bonding evaluation of them with their foster parents and the May 30, 1996 evaluation with L.R., moreover, reflect a strong dependence of L.H. upon C.H. Our decision requires DYFS to initiate reunification efforts with L.R. In light of L.R.'s close ties with L.H. and the prospect of significant harm in separating him from C.H., DYFS should consider reunification of him with L.R. along with C.H. and R.H.